BACKGROUND INFORMATION NOTE
(PAGE 1)

**Case Name:** Section 351 Short Sales

**Control Number:** TR-33-57-95 **Branch Symbols:** CC:DOM:CORP:1

**Record of Clearance**

**Initiator:** Richard Starke **Phone:** 622-7750

**Branch Reviewer:** Victor Penico **Phone:** 622-7750

| DOMESTIC COORDINATION | | OTHER COORDINATION | |
|---|---|---|---|
| ACC (FS) Reviewer | Date: | Name (Symbols) | Date: |
| Alfred C. Bishop Jr. | 04/13/95 | James F. Malloy CC:DOM:FI&P | 04/13/95 |
| Other Reviewer (Symbols) | Date | Name (Symbols) | Date: |
| | / / | Paul F. Kugler CC:DOM:P&SI | 04/13/95 |

**ASSISTANT CHIEF COUNSEL**

**Date Submitted:** 04/11/95 **Date Cleared:** 04/13/95

**Other Contact Person (Phone):** Philip J. Levine (622-7710)

**ASSOCIATE CHIEF COUNSEL**

**Date Submitted:** 04/13/95 **Date Cleared:** 04/17/95

**CHIEF COUNSEL**

**Date Submitted:** 05/15/95 **Date Cleared:** / /

**COMMISSIONER**

**Date Submitted:** / / **Date Cleared:** / /

**TREASURY**

**Date Submitted:** / / **Date Cleared:** / /

011101

BACKGROUND INFORMATION NOTE

**HOLDING:** A corporation's assumption of its shareholder's obligation to provide replacement securities to close out a short sale constitutes the assumption of a liability for purposes of §§ 357 and 358 of the Internal Revenue Code. The amount of the liability, assuming that the shareholder (the short seller) sold the borrowed securities immediately upon borrowing them, equals the amount of the proceeds of that sale.

**SOURCE:** This project was established at the request of Treasury.

**REASON FOR PUBLICATION:** There are reports that some tax practitioners are advising shareholders, prior to a sale of their corporate shares, to enter into short sales, transfer the cash proceeds to their corporations and have the corporations assume the replacement obligations in § 351 exchanges, and then sell their stock. A taxpayer would take the position that under § 358 the contributed proceeds increase his stock basis but that the assumption of the replacement obligation is not the assumption of a liability and hence does not reduce his stock basis back down. The corporation would succeed to the shareholder's position in the short sale for purposes of determining the amount, timing, and character of gain or loss.

**CONTRARY ARGUMENTS:** (1) Deputy v. du Pont, 308 U.S. 488, 497-98 (1940), 1940-1 C.B. 118, 122, and Rev. Rul. 95-8, 1995-4 I.R.B. 29, found that the obligation to return securities identical to those borrowed and sold short did not constitute "indebtedness," but did not address the issue of whether the obligation is a "liability." (2) Contrary arguments exist as to what the amount of the liability is under §§ 357 and 358. The final section of the legal memorandum discusses the contrary arguments.

**COORDINATION:** CC:EBEO published Rev. Rul. 95-8, addressing whether short sales give rise to debt-financed income under § 514. CC:DOM:P&SI coordinated with CC:EBEO in issuing Rev. Rul. 95-26, the partnership short-sale revenue ruling, and CC:EBEO concluded that the partnership ruling did not affect its own position. We coordinated with CC:DOM:P&SI respecting the partnership ruling, and our ruling, that a short-sale replacement obligation is a liability for purposes of §§ 357 and 358, is consistent with the partnership ruling that it is a liability for purposes of § 752.

**RESEARCH STATEMENT:** Researched by preparer through May 14, 1995.

Nelson F. Crouch [signature]
Chief, Branch 1 (Corporate)

5/15/95
Date

**ATTACHMENTS:**
Proposed ruling
Legal memo
Rev. Rul. 88-77, 1988-2 C.B. 128
Rev. Rul. 95-8, 1995-4 I.R.B. 29
Rev. Rul. 95-26, 1995-14 I.R.B. 6

011102

Filename: Short Sale--RCLS Workfile
Directory: G:\95-45 2 Print
Template: C:\WINNT\Profiles\nocircs\Application Data\Microsoft\Templates\Normal.dot
Title: crpe consultation re shrt sals as liabts
Subject:
Author: Richard C. L. Starke
Keywords:
Comments:
Creation Date: 7/10/2002 4:11 PM
Change Number: 2
Last Saved On: 7/10/2002 4:11 PM
Last Saved By: Starke Richard C
Total Editing Time: 0 Minutes
Last Printed On: 7/10/2002 4:34 PM
As of Last Complete Printing
Number of Pages: 43 (approx.)
Number of Words: 19,922 (approx.)
Number of Characters: 105,588 (approx.)

Research.

Alexander debt-reserve recapture memo.

Addresses mutual thrifts wanting put their operations down into stock thrifts under the continuing mutual companies.

Issue: does tax benefit rule require recapture of the economically excessive portion of the thrifts' reserves upon transfer of their loans to the stock subsidiaries per § 351?

Per Supreme Court cases, tax-benefit doctrine applies when events occur that are fundamentally inconsistent with an earlier deduction.

Supreme Court case Hillsboro reaffirmed Nash ruling that there was no recovery or inconsistent event given that the FMV of the receivables was equal to the face amount less the reserves.

Hillsboro indicated that where a later inconsistent event occurs in the context of a nonrecognition provision, inherent tension exists between the tax-benefit rule and the nonrecognition provision; and a blanket rule cannot resolve the issue: the specific tax-exempt provision [e.g., § 351] must be examined.

Memo concludes that the policies of § 351 make tax-benefit recapture of the reserves improper.

In § 351 tenjs (versus corporate liquidations) no concerns exist about protecting the integrity of the corporate-level tax. In contrast to liquidations, § 351 transactions do not eliminate but in fact create an additional level of corporate tax. Moreover, § 351, unlike the liquidation regime addressed in Bliss Dairy, provides a carryover asset basis to the corporation.

§ 351's purpose is to facilitate incorporations. Congress intended to permit changes in the form of business organization that did not involve choose in substance to be made "without undue restriction from the revenue laws". This Congressional purpose has been noted by the courts. Moreover, in the two major instances in which courts narrowly interpreted the nonrecognition rules of § 351 to create impediments to incorporation, Congress reversed these holdings by statute. (See §§ 357(a) and 357(c)(3).)

In § 351 exchanges, the tax-benefit rule and assignment-of-income doctrine have never applied to items involving property. For example these doctrines have not been applied to depreciated property re §§ 1245/1250; expensed property; LIFO inventory; installment obligations; accounts receivable of cash-method taxpayers; WIP under the completed-contract method.

In § 351 exchanges, the tax-benefit rule and assignment-of-income doctrine have been applied to require a valuation of property in an otherwise tax-free transaction. To value an asset such as the loan portfolio would in effect require recognition of gain with respect to property in contravention of § 351.

Rather, in § 351 exchanges, the tax-benefit rule and assignment-of-income doctrine have applied only to items of deferred income that exist independently of the property transferred in the exchange (e.g., § 481 adjustments, insurance reserves, deferred prepaid subscriptions). In such cases, recapture occurs with respect to the entire item and the valuation of any asset is unnecessary.xxx

Short-sale 1950 legislative history.

Looked at history at 1950-2 C.B. 380 because of statement at BNA 184-4 A-20 that: "The legislative history makes it clear that they [the short-sale rules enacted in 1950] were intended to apply to the closing out of a short futures position by the exchange-mediated set-off against a long position". But the legislative history did not discuss this that I could see.

Philip Morris v. CIR, 104 T.C. no. 3 (1/23/95).

010796

/

Headnote: P borrowed in foreign currencies that it converted into U.S. dollars (and bought equipment) and (3 years) later repaid the borrowings in the same foreign currency, which it had purchased with U.S. dollars. Taxpayer reported its gain, represented by the difference in U.S. dollars between the value of the foreign currencies at the time of the borrowings and the U.S. dollar cost of the currencies used for repayment, as income from the discharge of indebtedness and elected to exclude such income from gross income under § 108 and reduce the basis in its assets under § 1017. Held: P's gain did not constitute income by reason of the discharge of indebtedness eligible for exclusion from gross income under § 108. Kentucky and Indiana Terminal Railroad Co. v. U.S., 330 F.2d 520 (6th Cir. 1964), has been sapped of its vitality by U.S. v. Centennial Savings Bank FSB, 499 U.S. 573 (1991).
IRS treated the gain not as § 61 mdr income and cancellation-of-indebtedness income eligible for the § 108 basis-reduction election.
Taxpayer argues (1) the borrowings must be accounted for as if they were dollar borrowings, (2) it satisfied its debt for fewer dollars than it originally borrowed, (3) the classic test of cancellation-of-indebtedness income has been satisfied and cnqnl the election to exclude from gross income under § 108 and to reduce basis under § 1017 apply. Taxpayer further argues that its exchange gain should be recomputed so as to represent the difference between the dollar value of the foreign currency on the date of the borrowings and the U.S. dollar value of that currency on the dates of repayment.
Taxpayer also suggests, without explanation or argument, that it is entitled to recognize gain or loss on the difference between the dollar value of the foreign currency used to repay the borrowings at the date that currency was acquired and such value at the time of repayment.
IRS argues that, because the foreign currency obligations were paid in full in the same currency, there was no "discharge of indebtedness" within the meaning of § 108 and therefore taxpayer is not entitled to exclude the exchange gain from income under that section. IRS further contends that, in any event, the exchange gain was not income from cancellation-of-indebtedness within the meaning of § 61(a)(12), and that the court should overrule its decision in National-Standard Co. V. CIR, 1980 T.C. 551 (1983), and hold that the exchange gain constituted short-term capital gain measured by the difference between the dollar value of the foreign currency on the date the indebtedness was incurred and the U.S. dollar value of the foreign currency used in repayment on the date it was acquired (not the date of repayment) and based upon a holding period measured from the date the foreign currency used for repayment was acquired and the date of repayment. IRS does not address the question of how we should treat the difference between the dollar's value on the date of acquisition of the foreign currency and such value on the date of repayment.
Neither party disputes the idea that exchange gain arises as a result of a transaction separate from the underlying transaction in respect of which the foreign currency or its proceeds in dollars were used, e.g., to acquire property, nor disagree that foreign currency in the hands of a U.S. taxpayer is property.
America-Southeast Asia Co. V. CIR, 26 T.C. 198 (1956), held that where U.S. taxpayer in the business of selling burlap borrowed in foreign currency to buy burlap, then later bought foreign currency at a cheaper rate to pay off the loan, did not experience capital gain arising from speculation in foreign exchange but instead realized ordinary income from its business of trade in burlap. But we did not address whether the income was cancellation-of-indebtedness income.
In National-Standard Co. v. CIR, taxpayer borrowed foreign currency to buy stock, sold the stock, then used depreciated dollars to buy foreign currency to

010797

2

pay back the debt. We held that there was no sale or exchange of foreign currency.

We are not disposed to deem the borrowings and repayments herein as representing only dollar transactions and ignore the fact that they were undertaken and implemented in accordance with their terms; i.e., in foreign currencies.

Our disposition of the issue turns upon whether we should apply Kentucky & Indiana or Centennial Savings.

In Kentucky & Indiana taxpayer issued bonds for pounds. 40 years later it repurchased somo of these, some for pounds, some for dollars. The face amount of the bonds exceeded the repurchase price because of two things: (1) discount between the face amount of the bonds in dollars and the acquisition price, (2) depreciation over the 40 years of the pound. Taxpayer elected basis reduction (cancellation-of-indebtedness) re both elements, but IRS allowed it re only (1). 6th Cir. allowed it for both (1) and (2), reasoning that the exchange gain represented by the second element would not have been realized "except for the discharge of the indebtedness incurred".

In Centennial Savings, the issue was whether a penalty for early withdrawal of time deposits, in accordance with restrictions in the agreements governing the deposits, constituted income from the discharge of indebtedness eligible for §§ 108/1017 basis reduction. S. Ct. held no, because the withdrawal, consisting of the face amount of the deposit less the penalty for early withdrawal, was in accordance with the terms of the deposit, i.e., at the agreed face value under such circumstances.

(The Tax Court does not think) Centennial Savings meant to confine its impact to situations where the amount of the repayment of debt at less than face is "determinable under the express terms of the original borrowing documentation". The S. Ct. said "§ 108 uses 'income by reason of the discharge . . . of indebtedness' to refer to the change in the debtor's financial condition when the debtor is no longer legally required to satisfy his debt either in part or in full. 'Discharge' in this sense can occur only if the creditor cancels or forgives a repayment obligation." The Supreme Court said: "Congress did not intend to extend the benefits of § 108 beyond the setting in which a creditor agrees to release a debtor from an obligation assumed at the outset of the relationship". Centennial Savings sapped Kentucky & Indiana of its vitality.

The conclusion that the occasion may differ from the reason for realization finds support in the fact that taxpayer would have had no taxable gain absent its conversion of the proceeds of the borrowing to, and the obtaining of the means of repayment from, dollars. If the foreign currency had not been exchanged, and instead held in its borrowed form, taxpayer would have had a loss (albeit unrealized) on the value of its currency in hand exactly offsetting the economic gain (albeit unrealized) from repayment in a devalued currency, and thus no gain or loss for tax purposes. Taxpayer has taxable gain on the occasion of the discharge of its indebtedness but only because it exchanged the foreign currency for dollars (the reason).

The §§ 108/1017 legislative history speaks of taxpayers acquiring their debt "at less than their face value", of repurchase by a corporation of its bonds at a discount (i.e., less than face).

In short, we hold that taxpayer's exchange gain was not "includible in gross income by reason of the discharge" of its indebtedness within the meaning of § 108, and therefore taxpayer is not entitled to elect to exclude such income under § 108 and reduce the basis in its assets under § 1017. Under the circumstances of this case, where, as far as we can determine, the amount to be included does not depend upon its characterization as ordinary income or short-term capital gain, we have no need to address the IRS's argument in

this respect. It does not necessary follow, as the IRS appears to assert, that a holding that income does not arise "by reason of the discharge . . . of indebtedness" requires the conclusion that it is not "income from discharge of indebtedness" under § 61(a)(12). Similarly, we find it unnecessary to consider taxpayer's suggestion that we break the exchange gain into two parts.

Focht v. CIR, 68 T.C. 223 (1977).

Cash-basis sole proprietorship.

"We have heretofore held, in a multitude of cases, that the term "liabilities" as used in § 357 should be given an all-inclusive meaning."

Both Bongiovanni and Thatcher were circuit court opinions reversing Tax Court decisions that the § 357(c) term "liabilities" should be applied strictly. Thatcher commended the Bongiovanni result but was uncomfortable with Bongiovanni's rationale, saying: "There the court defined liabilities in an ad hoc manner that may have worked equity in that case, but the definition is likely to produce unforeseen results in other cases." Thatcher adopted this rationale: a setoff of deductible trade accounts payable against trade accounts receivable, up to the lesser of the trade accounts payable or the gain recognized under § 357(c) ("The statutory purpose is far better served if payables paid by the transferee in the taxable year of transfer are treated as deductible to the transferor to the extent the offsetting receivables are treated as received by him").

"It is reasonable to conclude . . . that [§ 358 etc.] were intended to affect only liabilities, similar to those under Hendler, that, if assumed (or taken subject to) by the transferee in a tax-free exchange, would cause gain recognition."

Crane "did not consider, as an amount realized by the transferor, the interest due on the mortgage and unpaid at the time of the transfer." IRS conceded on brief that "the amount of interest [etc.] should be disregarded from the computation of amount realized, because they were deductible from gross income or from the proceeds of sale."

"It is apparent that in construing § 357, § 357(c) is applicable only as an exception to § 357(a). Where § 357(a) does not apply, § 357(c) should not apply. Hence, the term "liability" in both of these sections should be limited to those obligations that, if transferred, cause gain recognition. An obligation to the extent that its payment would have been deductible if made by the transferor should not be such a liability."

"We believe our holding implements the aforenoted Congressional intent by preventing the recognition of gain or loss where there has been a mere change in form ownership in a tax-free reorganization. The transferor has not sustained an economic benefit but only a theoretical gain."

"Applying our holding that the term 'liability', as used in §§ 357 and 358(d), does not include an obligation to the extent that its payment would have been deductible if made by the transferor results in the following: P has no § 357(c) gain; his X stock basis is $35; and X's basis in its assets is also $35. Upon sale of his stock P receives $15, the net worth of X, and recognizes a loss of $20. This leaves P in the same position, with respect to his stock, as he was with respect to his proprietorship's assets and liabilities prior to the transfer. X's assumption of P's liabilities is as if X had paid the money to P and then P had paid his creditors. [Citing Hendler and Crane.]"

"Under our theory since the accounts payable are deductible if paid by P, their assumption would not fall within §§ 357 and 358. . . . However, a cash basis taxpayer transferring a nondeductible liability realizes gain irrespective of whether he enjoyed a prior tax benefit, as actual payment would generate no additional tax deduction."

§ 704(c).

010799

4

It is the 1984 amendment to this section that the legislative history tying § 704 to § 357(c)(3) occurs under.

§ 704(c) itself.

Current § 704(c).

§ 704(c)(1)(A): When a partner contributes property, effectively allocate gain or loss or deduction to that date back to that partner.

§ 704(c)(1)(B): [I think] provision to tax that gain, etc., back to the contributing partner if the partnership distributes the property within 5 years to another partner (who then later sells it).

§ 704(c)(2): This appears to head off some sneaky circumvention of the § 704(c)(1) rules.

§ 704(c)(3): Other rules. Under regulations prescribed by the Secretary, rules similar to the rules of paragraph (1) shall apply to contributions by a partner (using the cash receipts and disbursements method of accounting) of accounts payable and other accrued but unpaid items.

§ 704(c) 1984-1989.

"Under regulations prescribed by the Secretary, income, gain, losses, and deductions with respect to property contributed to the partnership by a partner shall be shared among the partners so as to take account of the variation between the basis of the property to the partnership and its FMV at the time of contribution. Under regulations prescribed by the Secretary, rules similar to the rules of the preceding sentence shall apply to contributions by a partner (using the cash receipts and disbursements method of accounting) of accounts payable and other accrued but unpaid items."

§ 704(c) before 1984.

Relevant parts: "General rule. In determining a partner's distributive share of items described in § 702(a), depreciation, depletion, or gain or loss with respect to the property contributed to the partnership by a partner shall, except to the extent otherwise provided [below], be allocated among the partners in the same manner as if such property had been purchased by the partnership." "Effect of partnership agreement. If the partnership agreement so provides, depreciation, depletion, or gain or loss with respect to property contributed to the partnership by a partner shall, under regulations prescribed by the Secretary, be shared among the partners so as to take account of the variation between the basis of the property to the partnership and its FMV at the time of contribution."

Hempt, 490 F.2d 1172 (1974).

Read quickly re assignment-of-income etc. caveat in RR.

Crane.

"The question here is how a taxpayer who acquires depreciable property subject to an unassumed mortgage, holds it for a period, and finally sells it still so encumbered, must compute her taxable gain."

When she got the property it was appraised for Federal estate tax purposes at an amount exactly equal to the mortgage.

When she got the property, she cut a deal with the mortgagee that she would collect rent, pay all expenses, and turn the balance over to the mortgagee.

010800

5

She reported the gross income and took deductions including depreciation. Still, that did not pay off all the interest, and with the mortgagee threatening foreclosure, she sold the property, subject to the mortgage, for [roughly] $5t. She reported very little gain on the sale. Her theory was that the property she had owned was only equity, the excess of the value of the real estate over the amount of the mortgage. This is inconsistent with her taking $25t of deductions re the property over the years.
Neither she nor her buyer ever assumed liability for the mortgage.
The CIR explains that only the principal amount, rather than the total present debt secured by the mortgage, was deemed to be a measure of the amount realized, because the difference was attributable to interest due, a deductible item.
Lower court, accepting the taxpayer's petition, held that she was not entitled to the depreciation deductions she had taken.
Basis when she acquired the asset would have been "the FMV of the property". The issue is, what "property"?
Words in statutes should be interpreted when possible in their ordinary day-to-day sense, which does not mean the taxpayer's "equity". It would take a strong counterargument, therefore, to adopt the "equity" meaning.
[Although not entirely clear to me] the court points out that the code allows taxpayers to take depreciation based on basis. If that meant on the equity alone, they might represent only a tiny portion of the actual fall in value of the property. Or if basis were equity but depreciation were based on gross value of the property, there would be negative basis.
The Treasury has long allowed depreciation based on gross value, and Congress has not interfered. Government also argues that taking equity as depreciable basis would create a nightmare of continuing adjustments of equity and hence depreciation as payments are made on the mortgage. The court therefore infers that cost basis is that of the gross property [gross as used here and above and below is my term], not the equity. "Thus it appears that the applicable provisions of the Act expressly preclude an equity basis, and the use of it is contrary to certain implicit principles of income tax depreciation, and entails very great administrative difficulties".
Basis is reduced by depreciation deductions. Taxpayer argues that she was not entitled to depreciation because she did not suffer the capital loss, that the property was not worth more than the unassumed mortgage. No, answers the court, it has not been conclusively shown that the property was never during her ownership worth more than the mortgage. As for cases where it is clearly not, we do not need to decide that issue.
Re amount realized on the sale, the mortgage is properly included.
MEAT: "We think that a mortgagor, not personally liable on the debt, who sells the property subject to the mortgage and for additional consideration, realizes a benefit in the amount of the mortgage as well as the boot. Obviously, if the value of the property is less than the amount of the mortgage, a mortgagor who is not personally liable cannot realize a benefit equal to the mortgage. Consequently, a different problem might be encoutered where a mortgagor abandoned the property or transferred it subject to the mortgage without receiving boot. That is not this case. If a purchaser pays boot, it is immaterial as to our problem whether the mortgagor is also to receive money from the purchaser to discharge the mortgage prior to sale, or whether he is merely to transfer subject to the mortgage--it may make a difference to the purchaser and to the mortgagee, but not to the mortgagor. Or, put in another way, we are no more concerned with whether the mortgagor is, strictly speaking, a debtor on the mortgage, than we are with whether the benefit to him is, strictly speaking, a receipt of money or property. We are rather concerned with the reality that an owner of

property, mortgaged at a figure less than that at which the property will sell, must and will treat the conditions of the mortgage exactly as if they were his personal obligation. If he transfers subject to the mortgage, the benefit to him is as real and substantial as if the mortgage were discharged, or as if a personal debt in an equal amount had been assumed by another."
[My interpretation of final paragraph:] we cannot have people in effect getting two losses: depreciation and then lower gain on sale.
[Summary of court's determination whole mortgage in adjusted basis: (1) "property" in statute should get day-to-day meaning; (2) otherwise depreciation would represent only a tiny portion fall in value of the property (or if large deductions given drive basis negative); (3) Treasury's long allowed depreciation based on gross value, and Congress's not interfered; (4) depreciation based on equity would be a nightmare as principal payments are made.]
[Summary of court's determination mortgage should be in amount realized: if the property is worth more than the mortgage, it does not matter whether the taxpayer gets the cash and pays the mortgage or the buyer takes subject to the mortgagee (an owner of property, mortgaged at a figure less than that at which the property will sell, must and will treat the conditions of the mortgage exactly as if they were his personal obligations). "The crux of this case, really, is whether the law permits her to exclude allowable deductions from consideration in computing gain. We have already shown that, if it does, the taxpayer can enjoy a double deduction, in effect, on the same loss of assets."]

<u>Tufts</u>.

Does the holding in <u>Crane</u> apply where the unpaid amount of the nonrecourse mortgage exceeds the FMV of the property sold?

Facts.

Partnership borrowed non-recourse to develop property. The partners put in very little capital.
The market tanked, and a third party bought all the partnership interests, assuming the non-recourse mortgage and agreeing only to reimburse the partners' expenses up to $250 each.

Discussion.

§ 1001 defines amount realized as "the sum of any money received plus the FMV of the property (other than money) received."
The <u>Crane</u> court calculated amount realized the same way it had calculated basis, otherwise the taxpayer would get a tax loss that did not reflect an economic loss.
<u>Crane</u> concluded that the taxpayer obtained an economic benefit from the purchaser's assumption of the mortgage identical to the benefit conferred by the cancelation of personal debt. Because the value of the property in that case exceeded the amount of the mortgage, it was in Crane's economic interest to treat the mortgage as a personal obligation, so she could get the $2500 cash actually paid her on the sale (as if she had been given, in addition to this cash, cash to satisfy the mortgage).
MEAT: When a taxpayer receives a loan, he incurs an obligation to repay the loan at some future date. Because of this obligation, the loan proceeds do not qualify as income to the taxpayer. When he fulfills the obligation, the repayment of the loan likewise has no effect on his tax liability.
MEAT: Another consequence to the taxpayer from this obligation occurs when the taxpayer applies the loan proceeds to the purchase price of property used to secure the loan. Because of the obligation to repay, the taxpayer is entitled to include the amount of the loan in

010802

7

IRS-CC-000275

computing his basis in the property; the loan, under § 1012, is part of the taxpayer's cost of the property. Although a different approach might have been taken with respect to a non-recourse mortgage loan (fn.: the CIR might have adopted this theory . . . that a non-recourse mortgage is not true debt, but, instead, is a form of joint investment by the mortgagor and the mortgagee. On this approach, non-recourse debt would be considered a contingent liability, under which the mortgagor's payments on the debt gradually increase his interest in the property while decreasing that of the mortgagee. We express no view as to whether such an approach would be consistent with the statutory structure and, if so, and Crane were not on the books, whether that approach would be preferred over Crane's analysis. We note only that the Crane court's resolution of the basis issue presumed that when property is purchased with proceeds from a non-recourse mortgage, the purchaser becomes the sole owner of the property), the CIR has chosen to accord it the same treatment he gives to a recourse mortgage loan. The Court approved that choice in Crane. The choice and its resultant benefits to the taxpayer are predicated on the assumption that the mortgage will be repaid in few.
MEAT: When encumbered property is sold or otherwise disposed of and the purchaser assumes the mortgage, the associated extinguishment of the mortgagor's obligation to repay is accounted for in the computation of the amount realized. (Fn.: In this case, respondents received the face value of their note as loan proceeds. If they initially had given their note at a discount, the amount realized on the sale of the securing property might be limited to the funds actually received.) Because no difference between recourse and non-recourse obligations is recognized in calculating basis, Crane teaches that the CIR may ignore the non-recourse nature of the obligation in determining the amount realized upon disposition of the encumbered property. He thus may include in the amount realized the amount of the non-recourse mortgage assumed by purchaser. The rationale for this treatment is that the original inclusion of the amount of the mortgage in basis rstd on the assumption that the mortgagor incurred an obligation to repay. Moreover, this treatment balances the fact that the mortgagor originally received the proceeds of the non-recourse loan tax-free on the same assumption. Unless the outstanding amount of the mortgage is deemed to be realized, mortgagor effectively will have received untaxed income at the time the loan was extended and will have received an unwarranted non-recourse in the basis of his property. (Fn.: Although the Crane rule has some affinity with the tax benefit rule, the analysis we adopt is different. Our analysis applies even in the situation in which no deductions are taken. It focuses on the obligation to repay and its subsequent extinguishment, not on the taking and recovery of deductions. We do not address the validity of the double-deduction rationale.) The CIR's interpretation of § 1001(b) in this fashion cannot be said to be unreasonable.
MEAT: The only difference between this [non-recourse] mortgage and one on which the borrower is personally liable is that the mortgagee's remedy is limited to foreclosing on the securing property. This difference does not alter the nature of the obligation; its only effect is to shift from the borrower to the lender any potential loss caused by the devaluation of the property. If the FMV of the property falls below the amount of the outstanding obligation, the mortgagee's ability to protect its interests is impaired, for the

010803

8

mortgagor is free to abandon the property to mortgagee and be relieved of his obligation. This, however, does not erase the fact that the mortgagor received the loan proceeds tax-free and included them in his basis on the understanding that he had an obligation to repay the full amount. When the obligation is canceled, the mortgagor is relieved of his responsibility to repay the sum he originally received and thus realizes value to that extent within the meaning of § 1001(b).

MEAT: Moreover, this approach avoids the absurdity the Court recognized in Crane. Because of the remedy accompanying the mortgage in the non-recourse situation, the depreciation in the FMV of the property is relevant economically only to the mortgagee, who by lending on a non-recourse basis remains at risk. To permit the taxpayer to limit his realization to the FMV of the property would be to recognize a tax loss for which he has suffered no corresponding economic loses.

MEAT: In the specific circumstances of Crane, the economic benefit theory did support to CIR's treatment of the non-recourse mortgage as a personal obligation. The footnote in Crane acknowledged the limitations of that theory when applied to a different set of facts. Crane also stands for the broader proposition, however, that a non-recourse loan should be treated as a true loan. We therefore hold that a taxpayer must account for the proceeds of obligations he has received tax-free and included in basis. Nothing in either § 1001(b) or in the Court's prior decisions requires the CIR to permit a taxpayer to treat a sale of encumbered property asymmetrically, by including the proceeds of the non-recourse obligation in basis but not accounting for the proceeds upon transfer of the encumbered property.

Concurring opinion.

Crane established that a taxpayer could treat property as entirely his own, in spite of the "coinvestment" provided by his mortgagee in the form of a non-recourse loan. Justice would, if writing on a clean slate other than Crane, hold that amount realized from sale of property is limited to its FMV. The taxpayer would not enjoy a tax loss it did not suffer because the spread between the value of the property and the amount of the non-recourse mortgage would be cancellation-of-indebtedness income (the taxpayer had got the full loan proceeds earlier). This would also logically link amount realized on the property sale to the subsequent owners purchase basis in the property: i.e., same amount. The CIR however has adopted regulations to the contrary. As long as they are a reasonable interpretation of the statute (§ 1001), we should respect them, so the justice concurs with the decision of the majority (the perfect world discussed above would produce some capital gain and some ordinary income).

Deputy v. du Pont.

19% shareholder (du Pont) borrowed stock from a third party to provide to young managers. Legal considerations prevented the corporation itself providing the officers with the shares, but the corporation did provide them the purchase money. When it came time for du Pont to close the short sale obligation, du Pont, instead of using his own shares, borrowed shares from another source, effectively another short sale. Regarding this second short sale, however, he agreed to ultimately give the lender an amount of money

equal to the dividends paid on the shares while they were borrowed plus an amount equal to the second lender's tax expense.

du Pont tried to deduct, both as an ordinary and necessary business expense and as interest expense on indebtedness, those latter two sums when ultimately paid. The Supreme Court reversed allowance of the deduction, saying, first, that the expenses were not ordinary and necessary in the business of being a professional investor of one's own portfolio (rich du Pont) and, second, that the "well-known" meanings of the words "interest" and "indebtedness" should be applied, and that "in the business world 'interest on indebtedness' means compensation for the use or forebearance of money" [and this was not such]. The court also said "although an indebtedness is an obligation, an obligation is not necessary an 'indebtedness' within the meaning of [§ 163]".

Kahn & Oesterle, A Definition of "Liabilities" in §§ 357 and 358(d), 73 Mich. L. Rev. 461 (1975).

The origin of the term "liability" in §§ 357(a), 357(c) and 357(d) is found in what is now commonly called the "Crane doctrine". Crane held that the established practice of treating a transferee's assumption of a transferor's personal liability as an amount realized was equally applicable to the transferee's acceptance of property subject to a liability.

Bongiovanni.

It rejected earlier case (Raich) saying accounts payable of a cash basis taxpayer were subject to § 357(c). Bong. is one alternative to Raich. Reversing the Tax Court, Bong. held that the term "liability" in § 357(c) does not include accounts payable: "§ 357(c) was meant to apply to what might be called "tax liabilities", i.e., liens in excess of tax costs, particularly mortgages encumbering property transferred in a § 351 transaction. . . . The payables of a cash basis taxpayer are liabilities for accounting purposes but should not be considered liabilities for tax purposes under § 357(c) until they are paid." Bong.'s apparent exclusion of all accounts payable from the definition of "liabilities" is too broad; only those payables that would provide the transferor with a tax benefit (e.g., a deduction) when paid by him should be excluded. While the Second Circuit reached the correct result in Bong., the court failed to provide a logical standard for determining which obligations should constitute tax liabilities within the meaning of §§ 357 and 358. Accordingly, the Tax Court and several commentators have repudiated Bong. as contrary to clear statutory language.

Contribution of short-sale legs to corporation as triggering event.

BNA portfolio #348-2d: Transfers to Controlled Corporations: Related Problems.

Special miscellaneous items (page A-15).

Transfer of income rights.

The transfer of the right to receive income, if left unchallenged, may permit the party earning the income (i.e., the transferor) to shift the burden of taxation to the transferee corporation.

Re cash-basis taxpayers, the IRS, except for abusive situations, has not generally required the inclusion of any amount in the transferor's gross income either at the time of the § 351 exchange or at the time the transferee corporation receives the cash represented by the transferred item of income.

In abusive situations the IRS has attempted to prevent the party who earned the income, the transferor, from shifting the burden of taxation to the transferee corporation. In these situations, the IRS

010805



IRS-CC-000278

has challenged both the tax-free status of the transfer at the time of the § 351 exchange and, in the event that the transfer did not generate immediate taxation, the IRS has sought to tax the transferor when payments are made pursuant to the income right.

In challenging the transfer of a right to receive income to a controlled corporation, IRS has argued that:

- Right to receive income does not constitute an item of property.
- The taxpayer should realize gain upon the transfer of the right to receive income at the time of the transfer, since the transferor has received stock or securities representing the value of this income right.
- Under assignment-of-income doctrine, transferor should recognize unreported income, inherent in the transferred right when the transferee corporation collects the money attributable to that right.
- Under the clear-reflection-of-income doctrine, either the transferor's method of accounting is improper or there should be an allocation or other attribution of income, gain or deduction between transferor and transferee.

<u>Non-recognition of income at time of a transfer</u>.

- [§ 351 as generally accelerating ordinary income taxation to shareholder] has been rejected by courts and IRS, where the transfers occurred in connection with incorporation of a business.
  - In RR 80-198, IRS, finding for taxpayer, compared facts to <u>Hempt</u>: a valid business purpose for the transfer of assets (including the accounts receivable); transferor had neither accumulated accounts receivable nor prepaid accounts payable. IRS said it would not apply this favorable ruling where there was a tax-avoidance motive.

Assignment of income doctrine.

- General.
- Cases applying the assignment-of-income doctrine.
- Cases not applying the assignment-of-income doctrine.
- Summary of cases.

Clear reflection of income doctrine: §§ 446(b) and 482.

- Change of accounting method.
- Allocation of income.

Tax-benefit rule.

Payment of assumed liabilities.

010806

11

Business-purpose, continuity-of-interest, continuity-of-business-enterprise doctrines.
Step-transaction doctrine.

Orr, 78 T.C. 1059 (1982).

Travel agent takes deposits on trips. Those are § 357 liabilities and § 357(c)(3) (payment giving rise to deduction) is not available.

Black's law dictionary.

Executory: that which is yet to be fully executed or performed; that which remains to be carried into operation or effect; incomplete; depending upon a future performance or event. The opposite of "executed".

RR 80-199, 1980-2 C.B. 122.

IRS will follow Focht, not Bongiovanni or Thatcher. RR also notes that Focht's interpretation of the word "liabilities" [as not including those payment of which would give rise to a deduction] applies only to §§ 357(c) and 358(d), that this RR is not a basis for interpretation of the word "liability" under any other code §.

SFTR for § 357.

BNA #782, Boot Distributions and Assumption of Liabilities, A-11 to A-18.

§ 357(a) applies to §§ 351 and 361.

Notes that Type C uses the word liability to water down the solely-for-voting-stock requirement, but notes that § 357 is not operative there and that there are no provisions like §§ 357(a) and (b), though, e.g., § 357(c) could still operate to tax excess liabilities in a Type C as boot via § 361, though that would not affect basic qualification as a Type C: that is the point.

"Once one assumes that there has been an assumption, issues arise about whether the type of liability assumed is encompassed by § 368(a)(1)(C) or § 357(a). For example, a liability of the target corporation to pay nonparticipating bond holders in a bankruptcy reorganization was "determined and fixed in the reorganization" and, thus, disqualified under the criteria of Helvering v. Southwest Consolidated, 315 U.S. 194 (1942). Problems may be avoided by paying a liability out of the assets of the transferor corporation, or by having shareholders of the target corporation assume and pay a liability. Even though liabilities "determined and paid in the reorganization" are proscribed [in a Type C], this rule does not include expenses of the reorganization itself."

Assumption of stock warrants.

In RR 68-637, 1968-2 C.B. 158 [copy in file] (the holders of the warrants presumably recognized gain or loss under § 1001. The assumption should also be protected by § 357(a). Otherwise, the assumption might be boot, resulting in gain recognition to the transferor because the boot could not be distributed (as required by § 361(b)) to the shareholders of the transferor (or even to the creditors of the transferor if warrantholders are not viewed as creditors).), the IRS ruled that the substitution by an acquiring corporation in a Type C reorganization of its stock warrants and options, under the terms of stock warrants and employee stock options of the target corporation, was no different than the assumption of a liability under any other executory contract of the target. If any direct boot were paid to shareholders of the transferor, the combination of the direct boot, plus the amount of the assumed liabilities, might exceed the 20% boot relaxation limit of § 368(a)(2)(B). How to measure the amount of boot from the assumption of stock warrants and options is problematical.

Comment: it is possible that various non-debt contingent obligations under executory contracts are not properly viewed as the type of liability encompassed by the Hendler case, so that the assumption of

010807

12

IRS-CC-000280

the liability should not be treated as boot to the transferor even in the absence of § 357(a) (or the exclusions in § 368(a)(1)(C)). This result seems particularly appropriate under § 381, which provides that the acquiring corporation, in a unifying reorganization, steps into the shoes of the target corporation regarding a deduction for payments pursuant to assumed contingent obligations. See VCA Corp. v. U.S., 566 F.2d 1192 (Ct. Cl. 1977), allowing a deduction to an acquiring corporation for payment in settlement of a contingent obligation assumed from the transferor in a Type A, and RR 83-73, 1983-1 C.B. 1984, involving facts and a result similar to the VCA case. The assumption of a deductible liability should not require the protection of § 357 (or of § 368(a)(1)(C)) under the rationale of the Focht case. [Did not make notes of the rest of the section, which, though on the issues of stock warrants, seems to discuss whether they constitute securities instead of boot.]

Contingent liabilities owed to third parties.

Application of § 357(a) to contingent liabilities of a transferor in a § 351 or § 361 exchange apparently has rarely been questioned by IRS rulings or in litigated cases. One exception is the interim-financing advance involved in RR 72-434, which is an unusual case because the contingent liability was owed to the transferee acquiring corporation. The assumption by an acquiring corporation, in a Type C, of the target's contingent obligation pursuant to investor warrants and employee stock options, was determined in RR 68-637 not to be boot but rather "no different than the assumption of a liability under any other executory contract of" the target.

B&E § 12.65[2]: Definition of "liability" [for reorganization purposes].

In general.

It may be that the term "liability", for purposes of §§ 368(a)(1)(C), 357, and 358, is limited to passive obligations for the payment of money and does not include such active contractual obligations as the duty to perform services, supply or repair goods, lease or license property, refrain from competition, and so forth. On the other hand, it does not seem to be necessary that the obligation be fixed or determinable. Thus, contingent liabilities should be counted unless remote or speculative. RR 68-637, 1968-2 C.B. 158 (held that assumption of an acquired corporation's unexercised warrants and stock options qualified as a valid liability assumption under § 368(a)(1)(C) and did not constitute boot). See also RR 70-269, 1970-1 C.B. 1982 (substitution of stock options severable from concurrent Type B; no recognized gain or loss); RR 73-301, 1973-2 C.B. 215 (definition of "liability" in partnership context under § 752; contractual obligation to perform services not a § 752 liability); RR 88-77, 1988-2 C.B. 392 (accrued liabilities for unpaid expenses of cash basis partnership are not "liabilities" for § 752 by analogy to the § 357(c)(3) rule). But cf. Alan v. CIR, 86 T.C. 655 (1986), aff'd, 856 F.2d 1169 (8th Cir. 1988) (accrued but unpaid liabilities were part of amount realized per Tufts, even though previously deducted). See generally Lynch, "Transferring Assets Subject to Contingent Liabilities in Business Restructuring Transactions", 67 Taxes 1061 (12/89); Crane, "Accounting for Assumed Liabilities Not Yet Accrued by Seller", 48 Tax Notes 637 (7/30/90); New York State Bar Association Tax Section, "Report on Contingent Liabilities in Taxable Asset Acquisitions", 49 Tax Notes 883 (11/19/90); Youngwood, "The Tax

Treatment of Contingent Liabilities in Taxable Asset Acquisitions", 44 Tax Lawyer 765 (1991).

Preparation for 4/4/95 conference with front office, Penico, Rooney.
- Are there any perceived corporate abuses besides boosting basis, then selling?
- Issues I have been working on.
  - Liability amount.
    - Cash got.
      - Correct result; § 357(c)(3) focus on "to extent of basis created".
      - § 358 should duplicate gain that would be had if shareholder closed transaction then; Crane: should be in amount realized to extent created basis.
    - Value on date replacement obligation assumed (other than with mark-to-market).
    - Per a contingent liability analysis under § 338, a hanging § 358 issue until partnership closes short sale: no dual-level taxation on the short sale.
  - § 351 when equal or negative value?
    - Discuss our doubts.
  - No stock issued.
    - OK.
  - § 368(a)(1)(C) use and RR.

Analysis of lay-out of partnership Background Information Note.
- Holding.
  - Short sales create § 752 basis.
- Background.
  - RR 88-77 creating-basis rule.
  - We did not put it in partnership regulations recently issued, to keep them brief.
- Source.
  - Treasury established the project.
- Reason for publication.
  - Abuse inconsistent with IRS § 752 short-sale liability interpretation.
  - Describes what a short sale it is.
  - Numerical example showing what the abuse is; then gives IRS view of what correct basis number is.
- Pending regulations.
  - No proposed, draft, etc., regulations cover the issue.
  - Says why the issue should not instead be addressed in the partnership anti-abuse regulation: (a) we think the ruling gives the right technical result under current law; issuing a regulation would cast doubt on our confidence; (b) another, irrelevant reason.
- Contra arguments.
  - First, the borrowing leg of the short sale itself does not create basis. But for such-and-such reason we believe the basis rule should apply here.
  - Second, Deputy v. du Pont: but "liability" is different from "indebtedness".
  - Third, we are giving partners a way to create basis; but there are already other ways.
- Coordination.
  - EBEO published RR 95-8 that short sales did not create indebtedness re the UBTI rules. We have coordinated with them, and they agree that their position is not affected by our proposed ruling.
- Research statement.
  - The proposed RR has been researched through [date].
- Attachments.
  - RR 88-77, RR 95-8.

010809

14

Questions I might be asked.

That RR 88-77.

Significance of partnership case Helmer (probably find significance below).

Similarity to deep-in-the-money options.

P&SI says there is no relevant case under § 357, but mentions Bongiovanni.

Maybe to do.

RR 80-199, 1980-2 C.B. 122: announces IRS will follow Focht, not Bongiovanni.

Says its interpretation of "liability" applies only in § 351 regime, not elsewhere.

Conference with Crouch 1/9/95.

RR 95-8 just issued by EBEO: income from a short sale is not UBTI [I reviewed it; it cites a S. Ct. case under § 163 that the obligation to replace stock borrowed in a short sale is not "indebtedness", and the UBTI rules require indebtedness, so there is no UBTI.]

Brown etc. have asked Corporate how short sales would be treated under the liability rules of §§ 351, 357.

Conference with Jackal, FI&P, P&SI, Treasury, Crouch 1/9/95.

[These are very loose notes; I was not sure who represented who and heard a lot of vaguely reminiscent partnership tax law.]

RR 95-8 says a short sale does not create indebtedness, so income from short sale not UBTI.

So Brown is reluctant to say a short sale generates a liability.

Can it be an obligation without being indebtedness?

Brown suggested writing a regulation to cover all these questions.

Brown mentioned uncovered options. How would one be handled? Would the problem ever arise without a deep-in-the-money option? A '75 ('78?) case: people formed a partnership. The partnership got $1t for writing an option to sell its land. Option was fixed price. We tried say § 731 gain because partnership distributed the cash to partners. Partners said no, should be a § 752 liability there. But court said no, no obligation to repay. Certainly if the option were exercised, the partnership must transfer the land. [Case apparently called Helmer, discussed in McKee.]

If did it without a partnership, no gain.

Options and short sales have lot in common. In both cases bet (he seems, Treasury guy, say) same, though maybe different magnitude and cost.

Should we say short sale creates liability when an option does not? Worried about adverse selection: if want basis and gain, rely on Helmer using short sale, if not use option.

FI&P might say all options obligations [liabilities?]?

Mentions 446-5 [a regulation?] [get feeling quite important here]. FI&P apparently says every option, whether deep-in-money or not, is a § 752 obligation [liability?]. Others apparently disagree. (That is apparently at odds with Helmer; hence they are talking about maybe doing this as a regulation (overruling a case) rather than just a RR (or something).)

But P&SI has problems with that FI&P view.

P&SI wants keep "liabilities" narrow, not blow § 752 wide open.

Treasury does not like giving taxpayers selectivity [so we have FI&P, P&SI, Treasury positions: but does Treasury want handle it by going in same direction as FI&P?].

P&SI says there is no relevant case under § 357 (but mentions something like Bongiovanni). Jackal mentions a recent S corporation basis case (maybe Hitchins): S corporation did not formally substitute its note for shareholder's (?) debt, but essentially . . . : court talked about varying meanings of "liability".

They are trying to figure out what Brown's feeling was at last meeting.

What did he say: If options and short sales are the same, he does not want us handling them differently. Did he say that? Apparently Brown's worried this proposed ruling and RR 95-8 seem run in opposite directions. Re Helmer, etc., if we had to choose one poison or another, he tended agree with Helmet (a position IRS perhaps needs, lesser of two evils).

010810

15

Jackal: different answers at partner and partnership levels: Jackal does not like, thinks Helmer bad idea, thinks contrary to direction in which we are going.
Brown said Helmer's bad if just do § 705 only [believe McKee discusses this], so our ruling should say basis increase under § 752, not just § 705 [apparently McKee makes same point].
FI&P willing put out short sale ruling and say nothing about options. FI&P had argued against the EBEO ruling [95-8] as inconsistent with this proposed ruling, same thing worrying Brown. [Apparently a question whether to delete deep-in-money option language from RR. Jackal: we cannot mention them and leave them at that.]
Treasury [apparently] opposes leaving it open with possibly one rule for short sales but latitude for taxpayers re options (and does not think can do same for options in a RR, need regulation to overrule Helmer).
Whole issue is mismatch between inside and outside basis. Good [?] basis inside because agreed to do this in future [or because partnership has the cash?]: Treasury wants reach right result re outside basis too: a basis kick-up there too, no matter how get to that result, and only way there is § 752: using it to cram through result: understands it is not an entirely clean way of doing it.
P&SI does not want to broaden § 752, v. Treasury wants consistency if done inside or outside partnership.
Talked about meeting again next week [to try reach a consensus?].

Conference with Crouch 1/9/95.

Make sure there are no cases on point under § 351, 357.
Then decide whether Corporate wants the result to go one way or the other.
Consider § 357(b) too.

Review of P&SI's briefing memo for 3/7/95 meeting with Brown.

Executive summary.

Issue: does short sale by partnership create partnership liability under § 752?
RR 88-77: § 752 liabilities include an obligation to extent incurring it creates or increases basis of any partnership assets (including cash attributable to borrowings).
The cash received in the short sale increases the partnership's asset basis. Hence short sale creates a liability.
Recommendation: issue the RR.

Attachment to Chief Counsel Meeting Request Form.

Issue.

Original draft RR addressed both short sales and deep-in-money puts; held both created § 752 liabilities.
EBEO RR ruled short sales create obligations but not debt-financed property re § 514.
Chief Counsel asked that further consideration be given to (1) draft RR position on treatment of other arrangements such as options and deep-in-money puts, (2) possibility of addressing short sales under § 705(b) rather than § 752.

Treatment of other arrangements.

Options.

"Existing authority is contrary to a position that options create liabilities". Helmer held that no partnership liability is created upon receipt of option payments by a partnership; payments received were without restrictions except that upon exercise of the options the amounts would be applied against the purchase price.
"While we agree that existing authority prevents treating options as creating liabilities in the proposed RR, further consideration of the appropriateness of expanding the definition of liability is recommended. We recommend, in view of connection between liability definition under §§ 752

and 357(c), existing project examining liabilities re § 357(c) be expanded to include § 752 [apparently all re options]."

Deep-in-the-money puts.

Reference deleted in RR in light of recommendation to study options under the regulation project.

Treatment of short sales under § 705.

§ 705 determines basis in a partnership interest.

§ 705(a): basis of partnership interest determined under § 722 (re contributions to partnership) or § 742 (re transfers of partnership interests) increased by partner's share of taxable income under § 703(a), tax-exempt income and depletion, and decreased by distributions under § 733 and partner's share of losses and expenditures not deductible in calculating taxable income and not properly chargeable to capital account.

§ 705(b) provides alternative: regulations letting AB of partnership interest be determined by reference to partner's proportionate share of AB of partnership property on partnership "termination" [word in Code]. This method would apply to all assets, not just short sale proceeds.

[Summary:] For reason that § 705(b) was meant by Congress only to apply in, e.g., the case of simple partnerships, should not be used as the vehicle here.

Background information note.

Holding.

Background.

Source.

Treasury initiated this project.

Reason for publication.

Publication is needed because some taxpayers are engaging in short sales through partnerships with the hope of avoiding a basis increase in their partnership interests. This would enable taxpayers to create gains that can be offset by losses that would otherwise expire.

Example: A, an individual, with loss about to expire, forms a 50/50 partnership with B, an investment bank. A and B each contribute $100. The partnership borrows securities from its broker and sells them short for $500. Before the short sale closes, B sells its 50% interest, causing a § 708(b)(1)(B) termination. By taking the position that a partnership liability is not created, A's basis is not increased beyond A's initial $100 contribution. Therefore, on the deemed § 708(b)(1)(B) distribution, A has gain of $250 (distribution of $350 minus $100 basis). This gain lets A use the losses. IRS position is obligation creates a partnership liability and so each partner's share is included in its AB. So A's basis includes A's share of the partnership liability, resulting in basis of $350, and no gain.

Pending regulations.

P&SI does not believe alternative of attacking this via the proposed partnership anti-abuse regulation is advisable.

Contra arguments.

Re obligation creating basis per RR 88-77, the borrowing of the securities from the broker itself does not create basis; it is only the other leg, the short sale, that does that. Also, <u>Deputy v. du Pont</u> holds that a short sale does not create "indebtedness".

010812

17

The proposed RR will make it easier for partners to generate basis. (But there are other ways to do that.)

Coordination.

Research statement.

Draft RR.

[Plain and simple.]

Review of memo Crouch gave me he wrote in another case re §§ 351, 357, 358 generally.

Notes for preparation of corporate example that might go in RR.

B&E ¶ 3.06: Assumption of Liabilities.

IMPORTANT: Trade-off for non-taxation under § 357(a) of liability is the liability reduces basis in stock received: for § 358(d) purposes the assumption is treated as money received. The corporation's basis is the same under § 362(a)(1) as it would have been had there been no assumption.

B&E ¶ 3.06[2]: Does it matter whether the shareholder himself remains jointly liable to the broker? § 357(a) covers assumption of recourse debt secured by transferred property if the transferee agrees to pay (whether or not the transferor is released) and unsecured recourse debt if the transferee agrees to pay (whether or not the transferor is released) [as well as other types debt]. Also says: the assumption need not discharge the the transferor, but, if it does, the transferor does not have cancellation-of-indebtedness income. Also, later payment of the debt by the transferee ought not to be treated as taxable income to the transferor. B&E ¶ 3.06[2].

Where a corporation assumes a transferor's debt under § 357(a) and the corporation later pays the debt, that payment should not generate taxable income for the shareholder (it would contradict Congress's clear intention of reversing Hendler in enacting § 357), but the statute is not crystal clear. However, the courts have been wary of reopening an area that Congress attempted to put to rest. Courts view the tax-avoidance and business-purpose provisions of § 357(b) as the appropriate safeguard against improprieties under § 357(a). Page 3-26.

What abuses might § 357(b) head off? (But the government has a hard time winning under § 357(b).) Can § 357(b) even be applied if there is no "liability"? Result of § 357(b): assumption or acquisition treated as money received by transferor (i.e., as § 351(b) boot). "§ 357(a) rather than § 357(b) ordinarily should apply to mortgages, trade obligations, and the like arising out of the ordinary course of business; this should be so even though the transferor, at the time of contribution, is able to pay but chooses instead to have them assumed. Moreover, even borrowing on the eve of a transfer under § 351 is not necessarily fatal, since the taxpayer may be able to establish valid business reasons for the transfer."

IMPORTANT: § 357(c) differs from § 351(b) in a fundamental way. § 351(b) requires the transferor to compute his entire gain realized from receipt of stock and debt assumed and then to recognize that gain to the extent of boot received (including debt assumption as boot). § 357(c), however, in effect, treats the transferor's debt assumed as if it were the entire amount realized under § 1001(b) upon a taxable disposition of the property, ignoring the stock received. Because (1) the rules governing the basis of the stock received start with the property basis and first decrease the basis by the debt assumed or taken subject to and then increase the basis by gain that the transferor recognized, and (2) such recognized gain is equal to the excess of the debt over the property basis, then (3) the stock basis inexorably must end up being zero under this statutory provision. This regime also avoids the possibility of a negative basis in the stock received. Example given.

"Although the example just used . . . involves a realized gain to the transferor on the § 351 exchange, A is taxed on the excess of liabilities over basis

010813

regardless of the amount of gain realized and even if none is realized." Page 3-30.

IMPORTANT: When a mere contribution to capital is made, it appears that stock can be deemed issued and hence § 351 applied. Only full ¶ page 3-33.

Owen v. CIR: fact that taxpayer remained liable on debt does not prevent application of § 357(c); a novation is not required to trigger application of that provision; rather, mere assumption or taking subject to debt is enough. But Jackson v. CIR may be contrary where corporation did not assume the debt. Page 3-32.

[Speaking under § 357(c)(3) re incorporation of a business by a cash-basis taxpayer] the corporation takes a carryover zero basis in such receivables under § 362(a), the assumption of the payables is ignored for purposes of § 357(c), and the transferor's stock basis is not increased, because of the receivables, or decreased under § 358(d)(2), because of the assumption of the payables. Therefore, the transferor's entire potential gain is deferred, and the net income from the collection of the receivables is shifted to the corporation as discussed later in this chapter. An exception to this exception applies (with the result that the general rule of § 357(c) applies) to a cash-method taxpayer's liability incurred on a credit purchase of property the cost of which would be deductible when paid, rather than capitalized and depreciated. This exception, presumably, was thought to be necessary to prevent use of the temporary basis created on the credit acquisition of the property from sheltering any other potential § 357(c) gain inherent in the § 351 transaction (legislative history gives credit purchase of small tools as an example; even though the liability counts under § 357(c), that liability would be offset by the basis of the property acquired by incurring the debt). Page 3-34.

Kahn & Oesterle, A Definition of "Liabilities" in §§ 357 and 358(d), 73 Mich. L. Rev. 461 (1975).

§ 357(c) does not attempt to characterize the nature of the gain; § 357(c) is merely an exception to non-recognition treatment under § 351. Gain recognized by reason of § 357(c), therefore, must be reported as ordinary income, long-term capital gain, or short-term capital gain according to the nature and holding period of the transferred property. Pages 3-34, -35.

In determining whether § 357(c) is applicable, the aggregate amount of the liabilities is compared with the aggregate AB of the assets transferred.

Although at first it may seem strange that A can reduce his gain by transferring other property along with the mortgaged property, the theory underlying § 357(c)'s use of the total basis of all property transferred as the measure of A's gain may be that the properties transferred constitute a single investment of \$20t (aggregate basis of two properties contributed, only one mortgaged, in example here) from which A's total return so far amounts to \$30t (amount of mortgage assumed). Page 3-35.

IMPORTANT RE DIFFICULT VALUATION: Talks about perhaps leaving incorporations involving contingent liabilities open. [This may not be the only authority cited re amount uncertain] RR 55-119, 1955-1 C.B. 352, dealing with an annuity paid for property, allowed the payor to estimate the liability and adjust his basis or take a loss upon later payment of a different total amount. Page 3-38.

B&E ¶ 3.10: Transferor's Stock Basis.

In simplest situation (exchange under § 351 of property solely for stock) § 358(a)(1) provides that the basis of the stock received is the same as the basis of the property transferred. Page 3-49.

IMPORTANT: Gain on later selling the stock would ordinarily qualify as capital gain regardless of the nature of the property previously transferred to the corporation.

010814

14

IRS-CC-000287

IMPORTANT: § 358 is also applicable if the transferor received boot on the exchange. In such a case, § 351(b)(1) requires the transferor to recognize his gain on the exchange (if any were realized, i.e., if the value of what he received exceeded the AB of the property he gave up) to the extent of the FMV of the boot. § 358(a)(2) provides that the boot (except U.S. currency, which, in effect, always has a basis equal to its face amount) be given a basis equal to that same FMV. In addition, § 358(a)(1) provides that the basis of the nonrecognition property (i.e., the stock received on the exchange) is the same as the basis of the property given up, less the money and the FMV of the boot received, plus the gain recognized by the transferor on the exchange.

IMPORTANT: § 358(d) provides that the amount of the liability assumed by a transferee corporation or subject to which the transferee corporation takes property (other than a liability excluded under § 357(c)(3)) should be treated as money received by the transferor upon the exchange. This requirement, which is applicable whether the liability gives rise to income at the time of the exchange under § 357(b) or (c), or comes within the general rule of § 357(a), has the effect of reducing the basis that otherwise would be allocated under § 358(a)(1) to the nonrecognition property by the amount of the liability.

Holding periods tack only when capital-gain or § 1231 property is contributed, to keep contributor turning, e.g., ordinary gain on inventory immediately into [long-term] capital gain.

B&E ¶ 3.11: Transferee Corporation's Stock Basis.

IMPORTANT: § 362(a) provides that the basis to the transferee corporation of the property received on the exchange will be the transferor's basis for the property, increased by the amount of gain recognized to the transferor. Assumption of liabilities by the transferee does not enter into the calculation of the transferee's basis for the transferred property except to the extent the transferor recognizes gain under § 357(b) or (c).

IMPORTANT: The corporation's payment of assumed liabilities does not increase its basis in the assets acquired, since § 362(a) takes account of only the transferor's basis and the gain recognized by the transferor. Page 3-58.

B&E ¶ 3.13[3]: Corporate Basis and Deductions [re contributions to capital].

[IMPORTANT: § 362(a)(2) provides that the corporation's basis for property acquired as paid-in surplus or as a contribution to capital should be the same as the transferor's basis, increased by gain recognized to the transferor on the transaction. This is the same result as applied by § 362(a)(1) to the property received by the corporation in exchange for stock in a transaction under § 351. "Contribution to capital", for purposes of § 362(a)(2), presumably has the same meaning as under § 118], which meaning is informed by the reference of § 362(c)(1)(B) to a contribution "by a shareholder as such". . . . Since an outsider's contribution to a corporation's capital increases the corporation's net worth at no tax cost under § 118, however, § 362(c)(1) provides that property that is "not contributed by a shareholder as such" will have a zero basis in the hands of the transferee corporation. § 362(c)(2) provides that if the contribution consists of money, the corporation must reduce the basis of any property acquired within the following 12-month period with the contributed money, and, if enough property is not so acquired, the basis of other property held by the corporation must then be reduced pro tanto.

B&E ¶ 3.13[4][a]: [Treatment of shareholders making contributions to capital].

IMPORTANT: In stating that a shareholder's contribution to capital has no immediate tax consequences to the contributing party on the basis of the fact that the contribution is a capital expenditure, the Supreme Court apparently meant to exclude the transaction from gain, as well as loss, recognition. CIR v. Fink, 483 U.S. 89 (1987). A contribution of appreciated property by a