IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Nos. 04-1419 T, 05-1067 T

(Judge Mary Ellen Coster Williams)

---

K2 TRADING VENTURES, LLC,
NEW VISTA, LLC, TAX MATTERS PARTNER,

Plaintiff

v.

UNITED STATES,

Defendant

---

**DEFENDANT'S SUPPLEMENTAL PRETRIAL MEMORANDUM**

---

JOHN A. DICICCO
Acting Assistant Attorney General
STEVEN I. FRAHM
Acting Chief, Court of Federal Claims Section

STUART J. BASSIN
Attorney of Record
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Station
Washington, D.C. 20044
JENNIFER P. WILSON
Trial Attorney

**TABLE OF CONTENTS**

Page(s):

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

FACTUAL STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I. THE TRANSACTIONS TRANSFERRED TO K2 TRADING LACK ECONOMIC SUBSTANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

A. Applying this Court's analysis of the "Spread Transaction" in *Jade Trading*, the K2 Trading transactions lack economic substance . . . . . . . . . . . . . . . . . . . . . . . . 6

B. The factual distinctions asserted by plaintiffs are inconsequential. . . . . . . . . . . . 9

II. TREAS. REG. § 1.752-6 DEFEATS PLAINTIFFS' CONTENTIONS THAT THE K2 TRADING TRANSACTIONS PRODUCED THE INFLATED TAX BASIS REQUIRED TO SUPPORT THE TAX BENEFITS CLAIMED BY PLAINTIFFS . . . . . . . . . . . . . . 11

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**TABLE OF AUTHORITIES**

**Cases:**

*ACM Partnership v. Commissioner*, 157 F.3d 231 (3d Cir. 1998) . . . . . . . . . . . . . . . . . 10

*ASA Investerings Partnership v. Commissioner*, 201 F.3d 505 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Cemco Investors, LLC. v. United States*, 515 F.3d 749 (7th Cir. 2008) . . . . . . . . 9, 12, 14

*Coltec Industries, Inc. v. United States*, 454 F.3d 1340 (Fed. Cir. 2006) . . . . . . . . *passim*

*Dow Chemical Co. v. United States*, 435 F.3d 594 (6th Cir. 2006) . . . . . . . . . . . . . . . . . 10

**TABLE OF AUTHORITIES**
**(continued)**


*Gregory v. Helvering*, 293 U.S. 46 (1935) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Jade Trading, LLC. v. United States*, 80 Fed. Cl. 11 (2007) . . . . . . . . . . . . . . . . . *passim*

*Klamath Strategic Investment Fund, LLC v. United States*, 440 F. Supp. 2d 608 (E.D. Texas 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Knetsch v. United States*, 364 U.S. 361 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Kornman & Associates v. United States*, 527 F.3d 443 (5th Cir. 2008) . . . . . . . . . . . . . 11

*Long-Term Capital Holdings, Ltd. v. United States*, 330 F. Supp. 122 (D.Conn. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 10

*Nicole Rose Corp. v. Commissioner*, 320 F.3d 282 (2d Cir. 2002) . . . . . . . . . . . . . . . . . 10

*Sala v. United States*, - F.Supp. -, 2008 WL 1836693 (D. Colo., April 22, 2008) . . . . . 12

*Sheldon v. Commissioner*, 94 T.C. 738 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Stobie Creek Investments, LLC v. United States*, – Fed. Cl. –, Nos. 05-748T & 07-520T, (July 31, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*


**Statutes:**


26 U.S.C. § 7805(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14-15


**Miscellaneous**


Community Renewal Tax Relief Act of 2000; Pub. L.106-554 . . . . . . . . . . . . . 13, 14-15

Treas. Reg. § 1.752-6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 11-14

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Nos. 04-1419 T, 05-1067 T

(Judge Mary Ellen Coster Williams)

K2 TRADING VENTURES, LLC,
NEW VISTA, LLC, TAX MATTERS PARTNER,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

**DEFENDANT'S SUPPLEMENTAL PRETRIAL MEMORANDUM**[1]

The owners of K2 Trading Ventures, LLC ("K2 Trading") are the promoters of a highly-abusive tax shelter known as the "Spread Transaction" (and by other similar names), which is designed to create artificial tax losses. This same tax shelter, executed by these same promoters on behalf of the Ervin families, was found to lack economic substance by this Court in *Jade Trading, LLC. v. United States,* 80 Fed. Cl. 11 (2007). Although plaintiffs contend that the transactions in this case differ from the transactions in *Jade Trading*, the differences are inconsequential; the differences derive mainly from the fact that the tax shelter promoters used their own tax shelter strategy without paying most of the extraordinary fees charged their customers.

[1]The United States filed its initial pretrial memorandum on August 18, 2006, providing the complete range of facts and arguments at issue in this case. Pursuant to the Court's order dated May 29, 2008, the United States files this memorandum in order to supplement, rather than supplant, the initial pretrial memorandum.

The United States is entitled to judgment for two independent reasons. First, the transactions at issue lack economic substance because they have a negative expected rate of return and are part of a tax shelter strategy; there was no economic purpose for the structure of the transactions or funneling them through K2 Trading; and the claimed tax benefits are purely fictional and disproportionately large compared to the amount invested and profit potential. Second, Treas. Reg. § 1.752-6 denies plaintiffs the inflated basis they claim in their K2 Trading ownership interests.

## STATEMENT OF THE ISSUES

(1) Whether the transactions executed by the Participants and transferred to K2 Trading as part of the "Spread Transaction" tax shelter strategy lack economic substance, as defined in *Coltec Industries, Inc. v. United States*, 454 F.3d 1340 (Fed. Cir. 2006), and *Jade Trading*.

(2) Whether Treas. Reg. § 1.752-6 applies to the "Spread Transactions," and thereby denies the Participants the inflated basis they claim in their K2 Trading ownership interests.

## FACTUAL STATEMENT

K2 Trading was owned primarily by entities controlled by Ari Bergmann and the other principals of Sentinel Advisors or its affiliate, New Vista (collectively referred to herein as "the "Participants"). Sentinel developed the "Spread Transaction" in conjunction with the Tax Solutions Group of BDO Seidman to provide customers with predetermined "tax losses" (but not corresponding economic losses) which they could use to offset unrelated taxable income. Eventually, dozens of customers executed the "Spread Transaction," paying Sentinel and New Vista (along with the other promoters) millions of dollars in fees.

The “Spread Transaction” executed by the Participants (just like the “Spread Transactions” executed by the Ervins and Sentinel’s other customers), consisted of three essential steps:

> (1) the simultaneous purchase and sale of large (but virtually offsetting) pairs of foreign currency options through AIG, creating a spread position;
>
> (2) the transfer of the spread position, along with a small amount of cash, to a purported partnership managed by Sentinel or New Vista; and
>
> (3) the redemption of the partnership interest in return for a marketable asset which (according to plaintiffs) has a tax basis far in excess of its economic value and which can be sold at a loss for tax purposes.

In connection with the “Spread Transaction,” each Participant was required to pay AIG the net premium on the spread positions and an upfront fee. Sentinel’s customers were required to pay these AIG fees in addition to other substantial fees to the promoters.

The Participants (with the exception of Udai Puramsetti) first executed the “Spread Transaction” during 1999, using an entity called Asuma Trading Ventures, LLC (“Asuma Trading”), and followed the three required steps precisely. Since withdrawing from Asuma Trading in December of 1999, the Participants have reported tax losses worth more than $36 million (in the aggregate) in the 1999, 2000, and 2001 tax years. After audit, the IRS issued an FPAA to Asuma rejecting those claims. Asuma is now challenging the IRS determinations in litigation pending in the United States Tax Court.

The Participants again executed the “Spread Transaction” in 2000, using K2 Trading as the partnership vehicle. Once again, the Participants followed the required steps for executing the “Spread Transaction” precisely. First, they purchased and sold offsetting options with AIG

on May 31, and June 5, 2000, each paying the net premiums and upfront fee to AIG.[2] Second, they formed K2 Trading, and transferred their options (and some cash) to K2 Trading on July 24, 25, and 27, 2000. Third, the Participants withdrew from K2 Trading on December 12, 2000, and April 18 and 19, 2001, receiving foreign currency and stock in distribution.

The Participants (with the exception of Udai Puramsetti) have not yet claimed artificial tax losses created by the K2 Trading transactions, in part because they were able to use the artificial losses generated through Asuma Trading to offset a large portion of their taxable income in the years 1999, 2000, and 2001. However, the Participants continue to hold assets obtained upon their withdrawal from K2 Trading, which they could potentially use to claim artificial tax losses of approximately $115 million dollars.

On August 13, 2000, just a few weeks after the Participants transferred their options to K2 Trading, the IRS issued Notice 2000-44, 2000-2 C.B. 255, stating that offsetting options transactions, such as the "Spread Transaction" developed and executed by the Participants, constituted an abusive tax shelter. K2 Trading filed partnership tax returns (Form 1065) for the two years it existed, 2000 and 2001. On April 13, 2004, and August 9, 2005, the Service issued FPAAs to K2 Trading challenging plaintiffs' reporting of the Spread Transaction for 2000 and 2001. Plaintiffs brought this suit to challenge the IRS determinations in those FPAAs.

---

[2]All of the Participants except Udai Puramsetti restruck these positions prior to transferring them to K2 Trading. Appendices A and B include tables showing the key figures with respect to the original spread positions and subsequent restrikes for each Participant.

## ARGUMENT

### I. THE TRANSACTIONS TRANSFERRED TO K2 TRADING LACK ECONOMIC SUBSTANCE

The economic substance doctrine "has been used to prevent taxpayers from subverting the legislative purpose of the tax code by engaging in transactions that are fictitious or lack economic reality simply to reap a tax benefit." *Coltec Industries, Inc. v. United States*, 454 F.3d 1340, 1353-54 (Fed. Cir. 2006); *see also Knetsch v. United States*, 364 U.S. 361, 366 (1960); *Gregory v. Helvering*, 293 U.S. 465, 469-70 (1935). That purpose is particularly well served in this case in which tax shelter promoters developed the "Spread Transaction" in order to generate hugely inflated, artificial tax losses for their customers through a transaction that has no reasonable possibility of yielding a profit, and then executed the tax strategy for themselves at a discount rate in order to offset their income gained from charging enormous fees to clients to execute the same tax strategy.

In the *Coltec* decision, the Federal Circuit established the legal framework for applying the economic substance doctrine to the facts of a particular case. *Coltec*, 454 F.3d at 1355-57; *see also Jade Trading*, 80 Fed. Cl. at 13; *Stobie Creek Investments, LLC v. United States*, – Fed. Cl. –, Nos. 05-748T & 07-520T, Slip Op. at 51 (Miller, J.) (July 31, 2008). This Court applied the *Coltec* analysis to the same "Spread Transaction" tax strategy that is at issue in this case in *Jade Trading*, and concluded that:

> In sum, this transaction's fictional loss, inability to realize a profit, lack of investment character, meaningless inclusion in a partnership, and disproportionate tax advantage as compared to the amount invested and potential return, compel a conclusion that the spread transaction objectively lacked economic substance. *Jade Trading*, 80 Fed. Cl. at 14.

#### A. Applying this Court's analysis of the "Spread Transaction" in *Jade Trading*, the K2 Trading transactions lack economic substance.

All five of the factors identified by this Court in *Jade Trading*, which flow from the Court's application of the *Coltec* principles, are present here and compel the conclusion that the K2 Trading transactions lack economic substance. First, the spread positions transferred to K2 Trading had a limited maximum profit potential and a negative expected rate of return, thus demonstrating that, objectively, these trades provided no reasonable possibility of realizing a profit. *Jade Trading*, 80 Fed. Cl. at 48-49; *see also Stobie Creek*, Slip op. at. 81-82, 84; *Long-Term Capital Holdings, Ltd. v. United States,* 330 F. Supp. 122, 181-86 (D.Conn. 2004), *aff'd* 150 Fed. Appx. 40 (2d Cir. 2005). Like the spread transactions in *Jade Trading*, there was no economically rational reason to undertake these investments absent the tax motivation.

The United States will present testimony from two expert witnesses, Drs. David DeRosa and Lawrence Kolbe, in order to explain the structure and economics of the spread positions that the Participants transferred to K2 Trading.[3] Dr. DeRosa will explain that the offsetting options have identical, very large face amounts and strike prices separated by 1/10 of a cent, or "10 pips." Because the options were almost perfectly offsetting, the Participants were at risk for only the net premiums. The extremely narrow 10-pips difference in strike prices drastically limits the maximum gross payoff of the offsetting options. The option spreads can produce a range of payoffs, with the minimum payoff occurring when the spot price at expiration is equal to the lower strike price, and the maximum payoff (roughly double the net premiums) occurring when the spot price at expiration is equal to or above the higher strike price of the two offsetting options. As a result of this structure, however, the maximum

[3]Dr. DeRosa is an expert in economics and foreign exchange trading, and Dr. Kolbe is an expert in financial economics.

payoff never increases further, no matter how high the spot rate rises above the higher strike price.

Drs. DeRosa and Kolbe will explain that the Participants could realize an actual net profit on the offsetting options *only* if the gross payoff on the offsetting options was greater than the net premiums paid by them, plus the upfront fee they each paid to AIG. Given the extremely narrow 10-pip difference in strike prices, the Participants' possibility of earning a net profit on the offsetting options was extremely limited. Moreover, their maximum profit potential would be, at best, a minuscule fraction of the enormous face amounts of the options.

However, taking into account the range of potential outcomes on the spread positions, Dr. Kolbe will explain that the *expected rates of return* were negative. For example, Bergmann had an expected return of a $230,010 loss on the spread positions he transferred to K2 Trading. The other Participants also had negative expected returns.[4] The negative expected rates of return on the Participants' spread positions derives largely from the high fees they each paid to AIG which make it impossible to reasonably expect a profit on the transactions. Dr. Kolbe will explain that rational economic actors ordinarily do not make investments in financial instruments or securities with negative expected rates of return, since they could easily allocate their available funds to other investments with positive expected returns.

Second, the spread positions transferred to K2 Trading were entered into as the first step in the "Spread Transaction" tax shelter strategy developed by Sentinel and BDO Seidman. The Participants followed the same three essential steps of the "Spread Transaction"

---

[4]Appendix C shows the expected rates of return on all of the spread positions contributed to K2 Trading.

precisely–just as they developed them with BDO Seidman, just as they executed them in order to claim enormous tax losses through Asuma Trading, and just as they executed them for numerous customers. These facts demonstrate that the K2 Trading transactions are not, as plaintiffs contend, unique investment strategies, but rather are one of the crucial steps in the "Spread Transaction" tax shelter strategy developed by the Participants. *See Stobie Creek*, Slip op. at 86.

Third, just as in *Jade Trading*, there was no economic purpose for creating K2 Trading, which imposed additional costs, or funneling the Participants' spread positions through K2 Trading, which did nothing to enhance their investment potential. *Jade Trading*, 80 Fed. Cl. at 46. In addition, Dr. Kolbe will explain that the Participants could have achieved the same economic results without executing huge offsetting positions. Indeed, the only result of executing options with such large face values was to increase the upfront fees paid to AIG, which were computed as a percentage of the premium paid for the purchased option.

Fourth, just as in *Jade Trading*, the claimed tax benefits generated by the transactions here are purely fictional. *Id*. at 45-46. For example, Bergmann executed two spread positions with AIG for a total net premium of about $200,000. Yet, after he transferred his spread positions to K2 Trading and then exited the partnership, Bergmann claimed a basis of over $24 million in his partnership interest. Under plaintiffs' view, this artificially inflated basis will result in a tax loss of just under $24 million when Bergmann sells the assets he received in distribution from K2 Trading.[5] Of course, Bergmann did not invest $24 million in the spread

---

[5]Indeed, another Participant, Udai Puramsetti, already sold some of the assets he received in distribution from K2 Trading and reported a tax loss of $246,705 in 2000, based on an artificially inflated basis in his K2 Trading ownership interest.

positions he transferred to K2 Trading, did not lose $24 million upon exiting K2 Trading, and will not lose $24 million upon selling the assets he received in distribution. In other words, the potential tax losses generated by Bergmann's transaction are purely fictional. *See Cemco Investors, LLC. v. United States*, 515 F.3d 749, 751 (7th Cir. 2008).

Finally, the total tax losses purportedly generated by the Participants (collectively, about $115 million) are disproportionately large as compared to the total amount invested (about $1 million) and the total maximum potential profit (about $800,000). *Jade Trading*, 80 Fed. Cl. at 14; *ASA Investerings Partnership v. Comm'r*, 201 F.3d 505, 513, 515-16 (D.C. Cir. 2000); *Sheldon v. Comm'r*, 94 T.C. 738, 768 (1990). Thus, even the largest profit the Participants could have conceivably made was a small percentage of the artificial basis (and eventual paper tax losses) generated by the transactions.

**B. The factual distinctions asserted by plaintiffs are inconsequential.**

Plaintiffs contend that, because the Participants did not pay themselves the same fees they charged their customers, their spread positions offered a *possibility* to make a net profit. The Participants paid a lower fee to AIG[6]; did not pay the $750,000 New Vista fee; and were able to obtain tax opinions from BDO Seidman for a fraction of the price that Curtis Mallet charged other customers. As a result, the Participants' spreads did offer a *possibility* of earning a net profit, whereas the spreads executed by the Ervins did not offer even that possibility. However, even with the much lower fees, the Participants' spread positions still had negative expected rates of return, and thus provided no *reasonable possibility* of realizing a profit. The

[6]The Participants actually paid a fee of .02%, instead of the full .0275% called for by the Master Trading Agreement (and paid by their customers). It appears that the Participants received a discount rate from AIG, presumably as a result of the considerable business Sentinel brought to AIG in connection with the "Spread Transaction."

expected rate of return, which reflects the reasonable possibility of realizing a profit, not the mere possibility of a net profit (without consideration of the likelihood of a profitable outcome), is the correct legal standard. *Stobie Creek*, Slip op. at. 81-82, 84.

Plaintiffs also attempt to distinguish their transactions from those in *Jade Trading* by asserting that the Participants hoped to realize significant profits with a "dynamic strategy," or repeatedly trading the spread positions prior to expiration–something they did not actually do. Under *Coltec*, however, the analysis is limited to examining solely the transaction which produces the tax benefits, and not collateral or theoretical transactions. *Coltec*, 454 F.3d at 1356-1357; *see also Jade Trading*, 80 Fed. Cl. at 48; *Dow Chemical Co. v. United States*, 435 F.3d 594, 601-02 (6th Cir. 2006); *Nicole Rose Corp. v. Comm'r*, 320 F.3d 282, 283-84 (2d Cir. 2002); *ACM Partnership v. Comm'r*, 157 F.3d 231, 260 (3d Cir. 1998); *Long-Term Capital Holdings*, 330 F. Supp. 2d at 171.

In addition to being legally irrelevant, plaintiffs' assertion that these particular trades were part of a "dynamic strategy" has no objective basis. *See Coltec*, 454 F.3d at 1359. The Participants did not engage in a "dynamic strategy" after contributing the spread positions to K2 Trading. Instead, the objective evidence demonstrates that the trades were the first of three steps required to execute the "Spread Transaction" tax strategy. The Participants executed these steps precisely once before, through Asuma Trading, and claimed more than $36 million in artificial tax losses. It defies belief to suggest that, in this instance, the Participants executed the same exact series of steps for a purpose other than to generate paper tax losses.

Moreover, plaintiffs' expert witness, Dr. Nicholas Nassim Taleb, has made no effort to quantify an expected (or even a maximum) return from the asserted "dynamic strategy." This fault is fatal, since plaintiffs bear the burden of proving that their transactions had economic

substance. As a result, even if the Court were to accept (without evidence) the assertion that the Participants planned to undertake a "dynamic strategy," there will be no way for the Court to determine whether the theoretical return on such strategy would be positive. *See Stobie Creek*, Slip op. at 80.

In sum, the spread positions executed by the Participants and then transferred to K2 Trading are identical in all material aspects to the spread positions entered into by the Ervins and then transferred to Jade Trading, and the same factors compel the same conclusion here that the Court reached in *Jade Trading* – these transactions objectively lack economic substance.

## II. TREAS. REG. § 1.752-6 DEFEATS PLAINTIFFS' CONTENTIONS THAT THE K2 TRADING TRANSACTIONS PRODUCED THE INFLATED TAX BASIS REQUIRED TO SUPPORT THE TAX BENEFITS CLAIMED BY PLAINTIFFS

Treas. Reg. §1.752-6 (the "Regulation") contains a basis reduction rule applicable to partnership assumptions of the obligations of partners occurring after October 18, 1999, including the assumptions by K2 Trading of the Participants' spread positions.[7] Under the Regulation, if a partnership assumes a contributing partner's "fixed or contingent obligation to make payment," the contributing partner's basis in his partnership interest *(i.e.* "outside basis") is correspondingly reduced. The parties agree that, if the Regulation governs the assumptions at issue in this case, then the Participants will not be entitled to the tax benefits they claim.

---

[7]By its own terms, Treas. Reg. §1.752-6 only applies if a partnership assumes a liability of a partner "other than a liability to which section 752(a) and (b) apply." *See Kornman & Assoc. v. United States*, 527 F.3d 443, 462 (5th Cir. 2008). If the Court were to find that the obligation to cover the short option was a liability to which Sections 752(a) and (b) applied, the Regulation would be inapplicable.

Plaintiffs' primary challenge to the application of the Regulation to the K2 Trading transactions is their contention that the Regulation, which was promulgated in 2003, may not be retroactively applied to their transactions, which occurred three years earlier. That contention has been litigated on several prior occasions with differing results. The Seventh Circuit upheld the retroactive application of the Regulation in *CEMCO Investors LLC v. United States*, 515 F.3d 749 (7th Cir. 2008) (Easterbrook, C.J.). Conversely, three trial courts have ruled that the Regulation may not be applied retroactively. *Klamath Strategic Investment Fund, LLC v. United States*, 440 F.Supp.2d 608 (E.D. Texas 2006) (appeal pending); *Sala v. United States*, 2008 WL 1836693 (D. Colo., April 22, 2008); and *Stobie Creek*, Nos. 05-748T & 07-520T (July 31, 2008). The issue is one of law; the parties will not present testimony on this issue at the September 2008 hearing. Accordingly, we briefly summarize the central legal points here, but expect to address the issue more fully in post-trial briefs.

A. The retroactive application of regulations is governed by Code Section 7805(b), which generally provides that regulations may not apply retroactively unless specified conditions are met, stating (in pertinent part)–

> (b) RETROACTIVITY OF REGULATIONS.
> (1) In general. Except as otherwise provided in this subsection, no temporary, proposed, or final regulation . . . shall apply to any taxable period ending before. . . : (A) The date on which such regulation is filed with the Federal Register. . . .
> * * *
> (3) Prevention of Abuse. The Secretary may provide that any regulation may take effect or apply retroactively to prevent abuse.
> * * *
> (6) Congressional Authorization. The limitation of paragraph (1) may be superseded by a legislative grant from Congress authorizing the Secretary to prescribe the effective date with respect to any regulation.

Here, two of the conditions authorizing retroactive application of regulations apply: (1) Congress authorized retroactive application; and (2) the regulations are required to prevent abuse.

B. Congress authorized retroactive application of the Regulation in Section 309 of the Community Renewal Tax Relief Act of 2000, Pub. L.106-554 (the "2000 Act"). That statute, in relevant part, provides–

> (a) IN GENERAL.--Section 358 (relating to basis to distributees) is amended by adding at the end the following new subsection:
> "(h) SPECIAL RULES FOR ASSUMPTION OF LIABILITIES TO WHICH SUBSECTION (d) DOES NOT APPLY.--"(1) IN GENERAL.--If, after application of the other provisions of this section to an exchange or series of exchanges, the basis of property to which subsection (a)(1) applies exceeds the fair market value of such property, then such basis shall be reduced (but not below such fair market value) by the amount (determined as of the date of the exchange) of any liability--
> * * *
> "(3) LIABILITY.--For purposes of this subsection, the term 'liability' shall include any fixed or contingent obligation to make payment, without regard to whether the obligation is otherwise taken into account for purposes of this title.".
> * * *
> (c) APPLICATION OF COMPARABLE RULES TO PARTNERSHIPS AND S CORPORATIONS.--The Secretary of the Treasury or his delegate--
> (1) shall prescribe rules which provide appropriate adjustments under subchapter K of chapter 1 of the Internal Revenue Code of 1986 to prevent the acceleration or duplication of losses through the assumption of (or transfer of assets subject to) liabilities described in section 358(h)(3) of such Code (as added by subsection (a)) in transactions involving partnerships, and
> * * *
> (d) EFFECTIVE DATES.--
> (1) IN GENERAL.--The amendments made by this section shall apply to assumptions of liability after October 18, 1999.
> (2) RULES.--The rules prescribed under subsection (c) shall apply to assumptions of liability after October 18, 1999, or such later date as may be prescribed in such rules.

To summarize, that statute: (1) prohibited the contingent liability transaction which was the subject of the *Coltec* case by requiring basis reductions when contingent liabilities were

contributed to corporations along with assets; (2) directed the IRS to promulgate regulations addressing comparable issues which arose in the context of contributions of contingent liabilities to partnerships; and (3) directed the IRS to make those regulations effective retroactively.

The narrow legal issue presented in the decided cases and this litigation is whether retroactive application of the Regulation is authorized by this legislation. The Seventh Circuit held that retroactive application of the Regulation was authorized in *Cemco Investors*, reasoning that –

> [A]lthough regulations generally do not apply to transactions that occur before the initial publication date of a draft regulation, see 26 U.S.C. § 7805(b)(1)(C), the norm of prospective application "may be superseded by a legislative grant from Congress authorizing the Secretary to prescribe the effective date with respect to any regulation." 26 U.S.C. § 7805(b)(6). . . . Section 309(d)(2) of the 2000 Act adds that those regulations may be retroactive to October 18, 1999. That's the power the Commissioner used when promulgating Treas. Reg. § 1.752-6.

*Cemco Investors*, 515 F.3d at 752. The same analysis should apply here.[8]

C. Section 7805(b)(3) also authorizes the Service to apply regulations retroactively to prevent abuse. As the Court determined in *Jade Trading*, the "Spread Transaction" is an abusive tax shelter. *Jade Trading*, 80 Fed. Cl. at 57. The Regulation

---

[8]The Court in *Stobie Creek*, Slip op. at 48, reached a contrary conclusion, stating–

> [Congress] intended that Treasury promulgate rules that would address transactions involving the possible acceleration and/or duplication of losses – the type of transactions to which Congress directed its concern. . . . Treasury Regulation §1.752-6 cannot assume the status of a comparable rule or regulation when it does not speak to transactions involving the possible acceleration and/or duplication of losses.

We respectfully disagree with the Court's analysis for reasons that we will develop in a post-hearing brief.

prohibits precisely this kind of abuse. Accordingly, even if the Regulation was not expressively authorized by Section 309 of the 2000 Act, which it was, it could nevertheless be applied retroactively under Section 7805(b)(3).

**CONCLUSION**

For all the above reasons, the Court should enter judgment in favor of the United States and sustain the determinations made by the IRS in the FPAAs issued to K2 Trading.

Respectfully submitted,

*s/ Stuart J. Bassin*

STUART J. BASSIN
Attorney of Record
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Station
Washington, D.C. 20044
TEL: (202) 307-6418
FAX: (202) 514-9440
Stuart.J.Bassin@usdoj.gov

JOHN A. DICICCO
Acting Assistant Attorney General
STEVEN I. FRAHM
Acting Chief, Court of Federal Claims Section
JENNIFER P. WILSON
Trial Attorney

*s/ Steven I. Frahm*
Of Counsel

August 29, 2008