IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| K2 TRADING VENTURES, LLC, NEW VISTA, LLC, TAX MATTERS PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | Nos. 04-1419T, 05-1067T<br>Judge Mary Ellen Coster Williams |

**PLAINTIFF'S SUPPLEMENTAL PRETRIAL MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

**Mark D. Allison, Esq.**
**Felix B. Laughlin, Esq.**
**John F. Collins, Esq.**
**Dewey & LeBoeuf LLP**
**1301 Avenue of the Americas**
**New York, New York 10019**
**Telephone: 212/259-8000**

## TABLE OF CONTENTS

**Plaintiff's Supplemental Pretrial Memorandum of Contentions of Fact and Law** .....1

Introduction.....1

Statement of Facts.....2

Issues.....5

Argument.....6

I. Both the Spread Options and Their Transfer to K2 Trading Had Objective Economic Substance.....6

A. The Spread Options Positions Had Reasonable Profit Potential.....7

B. The Transfer of the Spread Options to K2 Trading Appreciably Affected the Economic Benefits of Each Investor.....9

C. A Finding That the Spread Options Positions in This Case Have Economic Substance Does Not Conflict With This Court's Precedent.....11

II. The Retroactive Application of Treas. Reg. § 1.752-6 Is Invalid or Inapplicable to the Assignment and Assumption of Sold Options to K2 Trading.....13

# TABLE OF AUTHORITIES

## CASES

Bowen v. Georgetown Univ. Hosp., 488 U.S. 204 (1988) .......... 14
Cemco Investors, LLC v. United States, 515 F.3d 749 (7th Cir. 2008) .......... 14
Chock Full O' Nuts Corp. v. United States, 453 F.2d 300 (2d Cir. 1971) .......... 14
Coltec Industries, Inc. v. United States, 454 F.3d 1340 (Fed. Cir. 2006) .......... passim
Drobny v. United States, 96-1 U.S.T.C. (CCH) ¶ 50,255 (Fed. Cir. 1996), reported in table at 86 F.3d 1174 .......... 6
Frank Lyon Co. v. United States, 435 U.S. 561, 583-84 (1978) .......... 6
Helmer v. Commissioner, 34 T.C.M. (CCH) 727 (1975) .......... 13
Jade Trading, LLC v. United States, 80 Fed. Cl. 11 (2007), appeal docketed, 2008-5045 (Fed. Cir. Feb. 25, 2008) .......... 7, 11, 12, 13
Klamath Strategic Inv. Fund, LLC v. United States, 440 F. Supp. 2d 608 (E.D. Tex. 2006) .......... 14
Rice's Toyota World, Inc. v. Commissioner, 752 F.2d 89 (4th Cir. 1985) .......... 7
Sala v. United States, 552 F. Supp. 2d 1167 (D. Colo. 2008) .......... 14
Stobie Creek Investments v. United States, No. 05-748T (Fed. Cl. July 31, 2008) .......... 11, 13, 14

## INTERNAL REVENUE CODE

Section 358(h)(2)(B) .......... 15
Section 752 .......... 13
Section 7491 .......... 7

## REGULATIONS

Treas. Reg. § 1.752-6 .......... 1, 6, 13, 14

## MISCELLANEOUS

Community Renewal Tax Act of 2000, Pub. L. No. 106-554, § 309, 114 Stat. 2763 .......... 14
Definition of Liabilities under Section 752 of the I.R.C., 68 Fed. Reg. 37,434 (proposed June 24, 2003) .......... 13
Notice 2000-44, 2002-2 C.B. 255 .......... 14, 15

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| K2 TRADING VENTURES, LLC, NEW VISTA, LLC, TAX MATTERS PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | Nos. 04-1419T, 05-1067T<br>Judge Mary Ellen Coster Williams |

**PLAINTIFF'S SUPPLEMENTAL PRETRIAL MEMORANDUM OF CONTENTIONS OF FACT AND LAW[1]**

**INTRODUCTION**

This case addresses the federal income tax treatment in 2000 of "spread options" on foreign currency and their contribution and assignment to a partnership known as K2 Trading Ventures, LLC ("K2 Trading"). By agreement of the parties and pursuant to a Court order, on September 17-19, 2008, the Court will preside over a limited scope trial for purposes of adjudicating only the following two issues: (1) the application of the objective component of the economic substance doctrine, as defined in Coltec Industries, Inc. v. United States, 454 F.3d 1340 (Fed. Cir. 2006); and (2) the validity and application of Treas. Reg. § 1.752-6 (issued June 24, 2003).[2] The factual record for purposes of the trial will be limited to the joint stipulation of facts filed with the Court on August 15, 2008 and the exhibits attached thereto, and the testimony

[1] This pretrial memorandum supplements plaintiff's pretrial memorandum of contentions of fact and law filed with the Court on July 28, 2006 and plaintiff's reply brief filed with the Court on September 8, 2006.

[2] The parties agree that to the extent the Court rules on these two issues in favor of plaintiff, the defendant is free to proceed to raise any of the other issues set forth in its pretrial brief filed with the Court on August 22, 2006 as part of a subsequent trial.

(and related demonstratives) of the parties' expert witnesses.

## STATEMENT OF FACTS

On May 31 and June 5, 2000, several principals and employees of Sentinel Advisors, LLC ("Sentinel Advisors"), a hedge fund manager then-located in New York, New York, executed a series of foreign currency options trades, together known as "spread options," on the Euro and British pound against the US dollar with AIG International, Inc. (AIG).[3] On June 7, 2000, following a rise in the Euro and British pound that had begun the month before, most of these options positions were "restruck,"[4] resulting in the receipt by the investors of cash profits amounting to about 12% of their aggregate initial investment ($120,000 on an approximately $1 million in net premia paid to AIG).[5]

Subsequently, the Euro and British pound currencies stalled in their appreciation against the US dollar. See JS Exhibit 246. On July 24 and 27, 2000, the investors from Sentinel Advisors contributed and assigned their options positions to K2 Trading, a limited liability company formed on July 19, 2000. See JS Exhibits 127 and 139 through 146.

The foreign currency options executed by the investors from Sentinel Advisors in May and June of 2000 were bought and sold simultaneously in the form of a "spread," and hence are known as "spread options." Each of the options that comprised the spread in this case were

[3] The investors from Sentinel Advisors were the following: Ari Bergmann (managing member); Abraham Pfeiffer (chief operating officer); Smita Conjeevaram (chief financial officer); Srini Conjeevaram (husband of Smita Conjeevaram); Michael Powlen (partner with Sentinel Advisors in New Vista, LLC); and Udai Puramsetti (foreign currency trader).

[4] As will be explained by plaintiff's expert witness, "restriking" the options is performed by entering into perfectly offsetting positions, which results in the realization of gain or loss, followed by entering into option trades with the same terms as the original positions except at different (in this case, higher) strike prices.

[5] See Joint Stipulation, para. 94-138 and JS Exhibit 124.

(approximately) one-year, European-style[6] plain vanilla call options with cash settlement, designed to produce a profit for the investors if the Euro and British pound currencies rose against the US dollar. As such, each investor purchased two call options from AIG (one US dollar/Euro trade and one US dollar/British pound trade) and simultaneously sold two call options to AIG on the same currencies. Each of the two options that comprised the spread were identical except that the strike prices of the sold call options were "ten pips" higher than the strike prices of the purchased call options (these trades are generally referred to as vertical spreads).[7] As a result, the premiums paid for the purchased call options were higher than those received from the sold call options. See JS Exhibit 124.

The foreign currency options at issue in this case were executed through AIG pursuant to separate master trading agreements entered into between each individual investor and AIG (most of the investors had preexisting master trading agreements with AIG). The master trading agreements included standard provisions for foreign currency options trading, including provisions relating to the posting of margin, the netting of payments between parties, and the assignment of positions to third parties. See JS Exhibits 11, 14, 16, 19, 22, 24, 26 and 28.

Typically, the premia for the purchase and sale of foreign currency options include a "bid-ask spread," reflecting the profit a foreign currency dealer earns on such trades.[8] None of the premia that the investors paid for the options in this case (either initially when the options were purchased or sold, or subsequently when they were restruck or terminated) included any

---

[6] A European-style option is one that can be exercised by the holder only within the last 24 hours before expiration.

[7] A "pip" is equal to one-thousandth of a cent (if, for example, the notional amount is in Euro currency) and is expressed as 0.0001. Thus ten pips is one-hundredth of a cent and is expressed as 0.0010.

[8] Dealers in foreign currencies generally purchase options at the "bid" price and sell such options at the "ask" price, the difference being the bid-ask spread.

embedded bid-ask spread. Instead, the investors paid a one-time, up-front amount to AIG, as reflected in paragraph 11.6 of most of the master trading agreements, in lieu of the bid-ask spread that would otherwise have been embedded in the purchase, sale, closing out and restriking of the options. See JS Exhibits 78 and 79. As a result, the investors could execute future trades of the options, including by restriking the options in order to capture profits as the Euro and British pound currencies rose against the US dollar, without incurring any additional transaction costs.

At the time the investors subsequently contributed and assigned their options positions to K2 Trading, the strike prices of many of those options positions were different from each other due to the timing of when the options were initially executed and/or restruck by each of the investors. See JS Exhibit 124. As a result, K2 Trading held a basket of different options positions on both the Euro and British pound currencies for the benefit of the investors. Additionally, due to the stall in the appreciation of the Euro and British pound currencies, K2 Trading provided a vehicle for longer-term management and trading of the currencies and, with the additional cash contributions by the investors,[9] the ability to provide leverage for other trading.

In December 2000, following a decline in the Euro and British pound currencies against the US dollar, one of the members of K2 Trading withdrew from the partnership and received stock in distribution of his interest (a stock that such member had previously traded profitably). See JS Exhibits 161 and 162. The other members of K2 Trading continued with their investments but eventually withdrew on April 30, 2001 (after a further continued slide of the

9 In addition to the investors identified in footnote 2 above, two other affiliates of Sentinel Advisors also contributed cash to and became members of K2 Trading in the fall of 2000. See JS Exhibits 137, 155 and 156.

Euro and British pound) and received distributions of foreign currency and stocks that had been purchased by K2 Trading in 2000 and earlier in 2001. See JS Exhibit 172.

With one exception, none of the members of K2 Trading has reported on any federal tax return any tax benefits from the transactions at issue in this case, whether or not they sold the foreign currency or stock received from K2 Trading; and indeed most of the foreign currency and stock received from K2 Trading is still held today by such investors.[10] No member of K2 Trading paid any fees to any person with respect to their investments in the spread options, other than the initial amounts paid to AIG in lieu of the bid/ask spreads. See Joint Stipulation, para. 179.

Plaintiff's expert witness, Dr. Nassim Taleb, is a reknown foreign currency options trader and risk management advisor who will testify about, among other things, the trading of foreign currency options in a spread strategy (including the use of spread options with a spread of ten pips), the profit potential for the foreign currency options trades executed by the investors from Sentinel Advisors, the purpose and mechanics of "restriking" options, the lack of bid-ask spread embedded in the trades at issue here, the terms of the master trading agreements and trade confirmations with AIG, and the diversification and other benefits of contributing and assigning options to a partnership such as K2 Trading.

## ISSUES

The trial in this case requires the Court to resolve the following factual and legal issues:

1. Whether the foreign currency options executed by the investors in this case, and the

[10] The only exception is with respect to Mr. Puramsetti who reported a loss of $246,705 for the 2000 tax year as a result of the sale of some of the stock he received upon his withdrawal from K2 Trading. See JS Exhibits 163, 238 and 239. To the extent other sales of assets received from K2 Trading occurred, the members of K2 Trading reported either no gain or loss from such dispositions or reported losses based on a tax basis equal to the fair market value of the assets upon distribution. See JS Exhibit 67.

subsequent contribution and assignment of those positions to K2 Trading, satisfy the objective component of the economic substance doctrine, as defined in Coltec Industries, Inc. v. United States, 454 F.3d 1340 (Fed. Cir. 2006).

2. Whether the retroactive application of Treas. Reg. § 1.752-6 is invalid as a matter of law or, alternatively, is inapplicable to the assignment and assumption of the foreign currency options by K2 Trading in this case.[11]

**ARGUMENT**

I. Both the Spread Options and Their Transfer to K2 Trading Had Objective Economic Substance

The Supreme Court has held that a transaction will be respected for tax purposes if "there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached." Frank Lyon Co. v. United States, 435 U.S. 561, 583-84 (1978).

The Court of Appeals for the Federal Circuit has previously interpreted this standard as requiring a two-pronged inquiry into the taxpayer's "subjective business purpose" and "objective economic substance," explaining: "To treat a transaction as a sham, the court must find (i) that the taxpayer was motivated by no business purposes other than obtaining tax benefits in entering the transaction, and (ii) that the transaction has no economic substance because no reasonable possibility of a profit exists." Drobny v. United States, 96-1 U.S.T.C. (CCH) ¶ 50,255 (Fed. Cir. 1996), reported in table at 86 F.3d 1174 (quoting Rice's Toyota World, Inc. v. Commissioner,

---

11 The Internal Revenue Code is set forth at Title 26 of the U.S. Code. For purposes of this memorandum, all Section or I.R.C. references are to the Internal Revenue Code of 1986, as amended, and all references to Regulations are to the Treasury Regulations promulgated thereunder, except as otherwise indicated.

752 F.2d 89, 91 (4th Cir. 1985)).

More recently, the Federal Circuit has stated that a transaction will be considered to have economic substance if the transaction meets any of the following alterative characteristics: (1) results in a reasonable possibility of profit, (2) varies control or changes the flow of economic benefits, or (3) appreciably affects the taxpayer's beneficial interest except to reduce his tax." Coltec Industries, Inc. v. United States, 454 F.3d 1340, 1360 (Fed. Cir. 2006).[12] Furthermore, in determining whether the transaction has economic substance, this Court has interpreted Coltec to require "an objective determination of whether a reasonable possibility of profit from the transaction existed, exclusive of tax benefits" as viewed "through the eyes of a 'prudent investor' at the time of the transaction." See Jade Trading, LLC v. United States, 80 Fed. Cl. 11, 48 (2007), appeal docketed, 2008-5045 (Fed. Cir. Feb. 25, 2008). In this case, the facts clearly demonstrate that the execution of the spread options and their subsequent transfer to K2 Trading satisfied the objective economic substance test as set forth in Coltec.

A. The Spread Options Positions Had Reasonable Profit Potential

Under the first of the Coltec alternative economic substance test requirements, the spread options positions at issue, either before or after their contribution and assignment to K2 Trading, all had a reasonable possibility to earn a profit for each of the investors from Sentinel Advisors. This profit potential existed in a number of ways.

[12] In Coltec, the Federal Circuit set forth what it considered to be the five "general principles" of the economic substance doctrine: (1) "although the taxpayer has an unquestioned right to decrease or avoid his taxes by means which the law permits," a taxpayer may not claim tax benefits from a transaction that "lacks economic reality;" (2) the taxpayer bears the burden of proving that the transaction has economic substance (although the Court was not faced with the application of Section 7491 which shifts the burden of proof to the government in the present case); (3) "the economic substance of a transaction must be viewed objectively rather than subjectively;" (4) the transaction to which the doctrine should be applied is the one that "gave rise to the alleged tax benefit;" and (5) arrangements between related parties require "particularly close scrutiny." Coltec, 454 F.3d at 1355-58.

First, the spread options positions were structured to have a spread of ten pips (i.e., one-hundredth of the notional currency) between the strike prices of the purchased and sold call options, a spread that is not unusual in foreign currency options trading. As such, Dr. Taleb will explain that, assuming the investors here never intended to trade their positions before maturity, the spot prices of the Euro and British pound needed to move upward against the US dollar by only approximately 100 pips (approximately one-tenth of a cent) prior to maturity (in about one year) in order for the investors to basically double their net investment and earn profits of about $1.1 million (without considering the AIG fees in lieu of the bid/ask spread). The evidence will further show that the daily movement of the Euro and British pound spot prices can be as much as several hundred pips per day, thus allowing substantial opportunities for the investors – on merely a static "buy and hold" basis – to earn profits at (or before) the maturity of the options.

Additionally, the investors here could have earned – and in fact did earn – profits from trading their options positions prior to maturity through "restriking." As Dr. Taleb will explain, restriking the options positions – essentially closing out the prior positions and reopening new positions that are identical except with new strike prices – allows the investors to take the cash profits out of their options and continue with their investments. Dr. Taleb will testify how this type of trading is an effective trading strategy that was enhanced by the agreement with AIG (embodied in paragraph 11.6 of most of the master trading agreements) which effectively eliminated the transaction costs from the trades. As a result, the investors were able to take cash profits upon any meaningful appreciation of the Euro and the British pound currencies. Indeed, as stipulated, the investors here were able to restrike their options positions, without any transaction costs, and after only a few days earn aggregate cash profits of $120,000 on a $1

million investment.[13] See Joint Stipulation, para. 139 and 140 and JS Exhibits 78, 79 and 124.

Dr. Taleb will also explain that there are many other trading strategies that could have been further utilized in order to profit from the spread options positions. For example, the investors could have increased the spread between the two options by restriking only one of the options (i.e., by increasing the strike prices of the sold call options and/or by decreasing the strike prices of the purchase call options), thereby increasing the amount of profits if the Euro and British pound currencies appreciated. Further, the investors could have decreased the spread between the two options through the same restriking process (i.e., by decreasing the strike prices of the sold call options and/or by increasing the strike prices of the purchased call options), allowing the investors to redeem cash out of their investments. Additionally, the investors could have bought back from AIG the sold call options, thereby leaving the investors with only the purchased call options positions (which eliminates entirely any limit to the investor's upside profit potential on a static basis).[14]

B. The Transfer of the Spread Options to K2 Trading Appreciably Affected the Economic Benefits of Each Investor

It is evident that the contribution and assignment of the options positions to K2 Trading, in addition to having profit potential, altered the flow of economic benefits to the investors and appreciably affected their beneficial interests in a manner unrelated to any potential tax benefits, thus satisfying the second and third of the Coltec alternative economic substance test requirements. The options transferred to K2 Trading had a number of varying terms with respect

---

[13] At no other time after the restriking of the options on June 7, 2000 did the spot prices of the Euro or British pound meaningfully appreciate against the US dollar to allow for further opportunities for restriking for profit before their maturity. See JS Exhibit 246.

[14] Dr. Taleb will explain that as the spot prices move against the investors (i.e., they move away from the strike prices and become "out of the money"), as occurred in this case, the value of the options decreases – and decreases substantially as the options approach maturity. As a result, the cost of purchasing the sold call options, for example, can become very inexpensive.

to both the Euro and British pound currency positions, including different notional amounts, different premia and different strike prices. See JS Exhibit 124. As a result of these different strike prices, which were a function of the fact that the options had been executed and/or restruck by the various investors at different points in time, the members of K2 Trading held interests in the options positions – through the partnership – that were appreciably different than those they had held prior to their contributions and assignments to the partnership.

K2 Trading, therefore, held a portfolio of varying options positions that increased the upside profit potential and decreased the downside risk to the investors by increasing the range of the strike prices. This increased profit potential is illustrated by the fact that the spread between the lowest and highest strike prices with respect to the call options on the British pound against the US dollar was 1.5120 to 1.5311, a difference of more than 19 pips and essentially a doubling of the spread for the collective investors.[15] See JS Exhibit 124. Likewise, the spread between the lowest and highest strike prices with respect to the call options on the Euro against the US dollar was 0.9550 to 0.9763, a difference of more than 21 pips and a further doubling of the spread for the collective investors. Id. As a result, a greater opportunity existed for all of the investors to profit from the options positions, thus resulting in a change in the flow of economic benefits to the investors.

---

15 For example, the Ari Bergmann Revocable Trust contributed and assigned call options on the British pound against the US dollar with a strike price on the purchased option of 1.5301 and a strike price on the sold option of 1.5311, a difference of 10 pips. However, because another investor, the Udai K. Puramsetti 1999 Revocable Trust, contributed a purchased option on the British pound against the US dollar with a strike price of 1.5120, the Ari Bergmann Revocable Trust, through K2 Trading, is able to participate in a spread that is 19 pips, increasing that trust's profit potential with respect to that position. Likewise, Mr. Puramsetti's trust is able to benefit from the contribution and assignment of Mr. Bergmann's positions. Because Mr. Puramsetti's sold option on the British pound against the US dollar had a strike price of 1.5130, his trust was able to benefit from the higher strike price on the sold option assigned to K2 Trading by Mr. Bergmann.

In addition to the enhanced profitability to the investors through the increased spread of the strike prices on the foreign currency options contributed and assigned to K2 Trading, the investors had additional opportunities for profit potential through any equity in the options positions (i.e., their net value) as well as the cash contributions to the partnership. The equity in the options could have been leveraged for other trading positions as the Euro and British pound currencies rose against the US dollar (which rise ultimately did not happen), and the cash contributions could have also allowed for other trades consistent with the investors' profit goals.

C. A Finding That the Spread Options Positions in This Case Have Economic Substance Does Not Conflict With This Court's Precedent

A finding that the spread options positions in this case satisfy the Coltec objective economic substance test is not contradicted by this Court's decisions in either Stobie Creek Investments v. United States, No. 05-748T (Fed. Cl. July 31, 2008), or Jade Trading, LLC v. United States, 80 Fed. Cl. 11 (2007), appeal docketed, 2008-5045 (Fed. Cir. Feb. 25, 2008) . In Stobie Creek, the Court of Federal Claims recently found, in applying the objective economic substance test, that the trades in that case (which involved spreads of two pips between digital options on two different currencies) lacked profit potential for several reasons not present here, namely overpriced options, substantial fees paid to advisors, and speculation on an historical anomaly in the decoupling of two currencies that required the spot price to hit a "sweet spot" in the spread between the two options. Slip Op. at 79-91. In this case, there was no mispricing of the options or any fees paid to advisors, and no requirement that the spot prices settle on a sweet spot to earn profits.

In Jade Trading, the Court of Federal Claims found that the spread options positions did not satisfy the objective economic substance test on the basis that the taxpayers there could not have earned profits on their positions after taking into account fees paid to various advisors. 80

Fed. Cl. at 49-50. Even assuming such findings in Jade Trading were correct (which is the subject of an appeal to the Federal Circuit), such facts are not present in this case and there were no cost impediments to the investors' abilities to earn profits in this case.

As will be demonstrated at trial, the investors in this case reasonably expected to earn profits based on a rise of the Euro and British pound currencies against the US dollar, each of which currencies had experienced significant appreciation against the US dollar in the weeks preceding the May 31 and June 5, 2000 trades in this case, as well as in the period leading up to the restriking of the options positions on June 7, 2000 for significant cash profits. For example, in the period between May 31 and June 7, 2000, the Euro appreciated by approximately 250 pips against the US dollar and the British pound increased by approximately 200 pips against the US dollar. See JS Exhibit 246. Most of the investors likewise had experience with spread options positions on the Euro during the summer of 1999 (using spread options of ten pips) and fall of 1999 (using so-called 1 by 2 spread options with 30 pips) in which they profited from the appreciation of the Euro against the US dollar.[16] The historical movements of the Euro and British pound against the US dollar was consistent with an expectation of an ability to earn profits on the investors' spread options positions in this case if such appreciation occurred, which has been confirmed by the extraordinary rise of the Euro and British pound currencies against the US dollar during the past 18 months.

---

16 The trades that occurred in the summer of 1999 also involved a series of restriking of the options positions as many as three times in three weeks. Eventually the investors contributed and assigned the spread options to a partnership known as Asuma Trading Ventures, LLC ("Asuma Trading"). Each of the members of Asuma Trading later reported losses from such partnership based on a disregarding of the sold call options as liabilities for tax purposes. Asuma Trading is the subject of a separate proceeding before the US Tax Court. The trades that occurred in the fall of 1999 were traded as three-month spread options positions and were never contributed and assigned to a partnership. See Joint Stipulation at 10-22.

II. The Retroactive Application of Treas. Reg. § 1.752-6 Is Invalid or Inapplicable to the Assignment and Assumption of Sold Options to K2 Trading

An underpinning legal issue in this case is whether sold (or short) options constitute "liabilities" for purposes of Section 752. This Court has resolved this issue by holding that sold options do not constitute liabilities under Section 752, following the principle of Helmer v. Commissioner, 34 T.C.M. (CCH) 727 (1975), and its progeny. Stobie Creek Investments, LLC v. United States, No. 05-748T, Slip. Op. at 39-44 (Fed. Cl. July 31, 2008); Jade Trading, LLC v. United States, Fed. Cl. 11, 48 (2007). As a result, absent the application of other tax code provisions or judicial doctrines, the tax basis of an interest in a partnership to which a sold call option is assigned is not decreased by the amount or value of such option.

In order to circumvent the application of Helmer, the government attempted to retroactively change the law through the adoption of Treas. Reg. § 1.752-6. Issued on June 24, 2003 – nearly three years after K2 Trading was formed and capitalized – Treas. Reg. § 1.752-6 purports to change retroactively the definition of a "liability" for purposes of Section 752 in the case of all assumptions of liabilities by partnerships occurring after October 18, 1999.[17] This Court recently considered the validity of the retroactive nature of Treas. Reg. § 1.752-6 and held that the retroactivity of such regulation is invalid. Stobie Creek Investments, LLC v. United States, No. 05-748T, Slip. Op. at 44-50. This decision of the Court of Federal Claims is in

---

17 In the preamble to these proposed regulations, the Treasury Department explained that the new definition applies to options and does not follow the definition of a liability in Helmer:

> Obligations include, but are not limited to . . . obligations under a short sale, and obligations under derivative financial instruments such as options, forward contracts, and futures contracts. The definition of a liability contained in these proposed regulations does not follow Helmer v. Commissioner, T.C. Memo 1975-160.

Definition of Liabilities under Section 752 of the I.R.C., 68 Fed. Reg. 37,434, 37,436 (proposed June 24, 2003) (emphasis added).

accord with the holdings of two federal district courts that have likewise addressed this issue. Sala v. United States, 552 F. Supp. 2d 1167, 1185 (D. Colo. 2008); Klamath Strategic Inv. Fund, LLC v. United States, 440 F. Supp. 2d 608, 621-26 (E.D. Tex. 2006).[18]

In each case, the above courts have held that the Treasury Department exceeded its congressional mandate to issue such a regulation in the context of transfers to partnerships, concluding that the regulatory authority granted by Congress in section 309 of the Community Renewal Tax Act of 2000, Pub. L. No. 106-554, § 309, 114 Stat. 2763A-587, -638, was limited to transfers of contingent liabilities that result in the "acceleration or duplication of losses." Because Treas. Reg. § 1.752-6 was not aimed at mitigating the acceleration or duplication of losses – but also sought to address losses from what the government in Stobie Creek, Sala and Klamath refers to as "inflated basis" – the regulation exceeded the government's authority and thus is invalid.[19]

Even assuming that Treas. Reg. § 1.752-6 was valid, a factual undertaking would be required to determine whether the regulation applied in this case. The regulation provides that a

---

18 Contra Cemco Investors, LLC v. United States, 515 F.3d 749, 752 (7th Cir. 2008) (holding that Treas. Reg. § 1.752-6 was valid). The Court in Stobie Creek observed that the Seventh Circuit in Cemco "did not offer a thorough analysis of the validity of retroactively applying" the regulation. Slip. Op. at 45

19 The district court in Klamath further held that Treasury Regulation § 1.752-6, as applied to transactions entered into prior to the August 11, 2000 issue date of Notice 2000-44 (like in the present case), was an abuse of discretion, and the district court noted that the "narrow time frame [of retroactivity], coupled with conduct the Service specifically calls out in the preamble of the Regulation, is a strong indication that the promulgation of the Regulation was to buttress the government litigation position in this and similar cases." 440 F. Supp. 2d at 625 (citing Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 213 (1988) ("Deference to what appears to be nothing more than an agency's convenient litigation position would be entirely inappropriate."); and Chock Full O' Nuts Corp. v. United States, 453 F.2d 300, 303 (2d Cir. 1971) ("[T]he Commissioner may not take advantage of his power to promulgate retroactive regulations during the course of a litigation for the purpose of providing himself with a defense based on the presumption of validity accorded to such regulation.")).

contingent liability reduces a partner's tax basis in a partnership interest unless the exception in Section 358(h)(2)(B) applies – which exception applies only if the contingent liability is transferred to the partnership as part of the transfer of substantially all of the assets to which such liability is associated (as occurred in this case). However, the exception in Section 358(h)(2)(B) does not apply if the assumption of liability is part of a transaction that is described in or substantially similar to Notice 2000-44, 2002-2 C.B. 255. The factual record for purposes of this trial does not support the conclusion that the transactions herein are described in or substantially similar to the transactions set forth in Notice 2000-44. In particular, the transactions described in Notice 2000-44 are those in which there is little or no economic outlay by the investors followed by their reporting of a tax loss, and there is no non-tax business purpose for the transactions. In contrast, here there were significant economic outlays and little or no tax losses reported by the investors, and there was substantial profit potential (and actual cash profits) in the transactions undertaken. In any event, to the extent that Notice 2000-44 requires an analysis of business purpose, such question must be reserved for any subsequent trial in this case on the subjective business purpose test under Coltec.

Respectfully submitted,

Dated: August 29, 2008

s/ Mark D. Allison
MARK D. ALLISON
Dewey & LeBoeuf LLP
1301 Avenue of the Americas
New York, NY 10019
Telephone: 212/259-6866
Facsimile: 212/259-6868

Felix B. Laughlin, Esq.
John F. Collins, Esq.

COUNSEL FOR PLAINTIFF