# In the United States Court of Federal Claims

### No. 04-1419T
### No. 05-1067T
### (Filed: November 30, 2011)

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

|  |  |  |
|---|---|---|
| | * | |
| **K2 TRADING VENTURES, LLC, NEW** | * | |
| **VISTA, LLC, TAX MATTERS PARTNER,** | * | **Partnership Tax;** |
| | * | **Lack of Economic Substance;** |
| **Plaintiff,** | * | **Outside Basis; Fictional Loss;** |
| | * | **Profit-Making Potential;** |
| **v.** | * | **Capability for Diversification;** |
| | * | **Meaningless Inclusion in a** |
| **UNITED STATES,** | * | **Partnership.** |
| | * | |
| **Defendant.** | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

Mark D. Allison, Felix B. Laughlin, and John F. Collins, Dewey & LeBoeuf LLP, 1301 Avenue of the Americas, New York, NY, for Plaintiff.

Joseph Syverson, John A. DiCicco, Jennifer Wilson and Shelley de Alth Leonard, Department of Justice, Tax Division, P.O. Box 26, Ben Franklin Post Office, Washington, D.C., for Defendant.   Steven I. Frahm, Department of Justice, Court of Federal Claims Section, Washington, D.C., Of Counsel.

_____

## OPINION AND ORDER
_____

**WILLIAMS**, Judge.

In this tax refund suit, K2 Trading Ventures, LLC ("K2") challenges the Internal Revenue Service's ("IRS") Final Partnership Administrative Adjustments ("FPAA") for tax years 2000 and 2001.  At issue is whether a type of spread transaction, contributed to K2 and used to generate a tax loss for one K2 member, lacked economic substance.

This Court is not writing on a clean slate with respect to either the spread transaction or the members of K2 who designed and promoted the transaction.  This case involves a transaction substantially similar to one found to lack economic substance in Jade Trading, LLC v. United States, 80 Fed. Cl. 11 (2007) ("Jade Trading I"), aff'd in part and rev'd on other grounds, 598 F.3d 1372 (Fed. Cir. 2010) ("Jade Trading II").  The transaction, recognized to be a "Son of BOSS" shelter by the Federal Circuit in Stobie Creek Investments LLC v. United States, "[takes]

advantage of the fact that assets and contingent liabilities were treated differently for tax purposes when contributed to a partnership, thus enabling the taxpayer to generate an artificial loss. This artificial loss is then used to offset income from other transactions." Stobie Creek, 608 F.3d 1366, 1368-69 (Fed. Cir. 2010) (citations omitted). In Jade Trading II, the Federal Circuit explained the shelter in detail:

> In general, the tax shelter here involved four steps: "1) Investment in Foreign Currency, 2) Contribution to a Partnership, 3) Partnership Investments, 4) Termination of Partnership Interests." The investor first simultaneously purchased a European-style call option and sold a European-style call option. The investor next contributed the purchased and sold call options to a partnership. The investor eventually exited the partnership, received an asset with a claimed high-basis and low-value, and then sold that asset in order to generate a tax loss. A tax loss was anticipated because, at the time of the facts giving rise to this case, an investor's basis in a partnership was ordinarily not decreased by the amount of a contingent liability contributed to or assessed by a partnership.

598 F.3d at 1374-75 (footnote omitted) (citations omitted) (quoting Jade Trading I, 80 Fed. Cl. at 24-25) (citing Jade Trading I, 80 Fed. Cl. at 25). Both the Federal Circuit and the Tenth Circuit have found that this type of transaction failed to satisfy the economic substance doctrine. Id. at 1374; Stobie Creek, 608 F.3d at 1380; Sala v. United States, 613 F.3d 1249, 1254 (10th Cir. 2010).

Against this backdrop, Plaintiff asks the Court to bless this particular spread transaction because the transaction -- unlike those in Jade Trading -- had some potential for profit. This effort fails, since profit potential is but one of several factors a court must look to when assessing economic substance. In Jade Trading II, the Federal Circuit found that the spread transaction contributed to Jade Trading lacked economic substance not solely due to a lack of profit potential, but due to a number of other, more dominant factors, including the transaction's fictional loss, meaningless inclusion in a partnership, and disproportionate tax advantage as compared to the amount invested and potential return. 598 F.3d at 1377. The essence of the K2 transaction, i.e., the generation of artificial inflated basis and a fictional tax loss, did not change merely because there was a potential for profit. In short, profit potential did not imbue the K-2 transaction with economic substance.

## Findings of Fact[1]

## The Evolution of the Spread Transaction

---

[1] These findings of fact are derived from the parties' Joint Stipulation of Facts and the accompanying Joint Exhibits. Moreover, the parties have stipulated that the Court may take judicial notice of certain facts in Jade Trading I. Joint Stip. ¶ 1. Those facts, while not essential to the Court's holding, provide context to the origin and use of the type of transaction at issue here. In addition, the Court has considered the relevant expert opinions presented at trial.

The K2 partners included the Ari Bergmann Revocable Trust ("Bergmann Trust"); Ari Bergmann 1999 Family Trust ("Bergmann Family Trust"); A.B.I.B. Family Partners, Ltd., a Colorado limited partnership formed by Ari and Iona Bergmann ("A.B.I.B."); Abraham J. Pfeiffer Revocable Trust ("Pfeiffer Trust"); Smita Conjeevaram 1999 Revocable Trust ("Smita Conjeevaram Trust"); Srini Conjeevaram 1999 Revocable Trust ("Srini Conjeevaram Trust"); Udai K. Puramsetti 1999 Revocable Trust ("Puramsetti Trust"); and Woodleaf Trust, formed by California Tax Attorney Michael Powlen.[2]   For convenience, the Court will refer to Messrs. Bergmann, Pfeiffer, Puramsetti, Powlen, the Conjeevarams, and all their respective entities, collectively, as the "Participants."

On April 1, 1997, Ari Bergmann and Abraham Pfeiffer formed Sentinel Advisors, LLC, ("Sentinel"), an investment management company located in New York, New York.  During the 2000 and 2001 tax years, Mr. Bergmann served as Sentinel's Managing Member, and Mr. Pfeiffer served as Sentinel's Chief Operating Officer.  Smita Conjeevaram joined Sentinel in April of 1999, and served as a member of Sentinel, as well as Sentinel's Chief Financial Officer, throughout the 2000 and 2001 tax years.  New Vista, LLC -- K2's Tax Matters Partner and Managing Member -- was a Sentinel subsidiary at all relevant periods.  Sentinel owned 75% of New Vista, with Mr. Powlen owning the remainder.  Udai Puramsetti was a foreign currency trader for Sentinel during the 2000 and 2001 tax years.

Mr. Bergmann formed the Bergmann Trust on December 1, 1998, and the Bergmann Family Trust on December 23, 1999.  Ari and Iona Bergmann formed A.B.I.B. on December 21, 1999.  Mr. Pfeiffer formed the Pfeiffer Trust on December 4, 1998.  On August 31, 1999, Ms. Conjeevaram formed the Smita Conjeevaram Trust, and Mr. Conjeevaram formed the Srini Conjeevaram Trust.  Udai Puramsetti formed the Puramsetti Trust on December 29, 1999.  Mr. Powlen formed Woodleaf Trust on July 7, 1999.

Earlier, between January and March of 1999, Mr. Bergmann had approached Charles Bee, a senior partner at the tax and accounting firm BDO Seidman, with the idea of using a spread transaction to generate tax benefits for clients.  On or about August 3, 1999, BDO Seidman updated its Tax Products Sales Manual to include a tax product called the "Spread Transaction," which purported to create a "stepped-up basis . . . to shelter gains."  Jade Trading I, 80 Fed. Cl. at 20 n.18.  As the Manual explained:

> There are several different transactions which might deal with capital gains. Although each is structured around different statutory provisions, and have various structural differences, they each rely on anomalies in the tax law to allow for the creation of stepped-up basis that can be used to shelter gains.

> Spread Transaction: This transaction requires a minimum gain of $15 million, and a taxpayer who meets certain minimum assets requirements that generally require gross assets of at least $10 million.

---

[2]   Through his company, MCS Asset Management, Morris Safdie also possessed an ownership stake in K2.  Joint Stip. ¶ 19.  The Court's analysis does not involve Mr. Safdie beyond noting his membership in Sentinel LLC, and his $20,000 cash contribution to K2 in exchange for a 4.61% ownership interest in the K2 partnership.

. . . .

The Spread Transaction involves the purchase and sale of foreign currency options, creating a spread position, which is contributed to a partnership. When the investor exits the partnership, a marketable asset is received which has a high-basis and low value, the sale of which generates a loss.

. . . .

These transactions are structured around anomalies in the tax law that allow for the creation of stepped-up basis that results in an ordinary loss that can be used to shelter ordinary income . . . .

Id. at 20 (citations omitted).

Sentinel's leadership eventually decided to use the spread transaction themselves. In July of 1999, the Bergmann Trust, Pfeiffer Trust, and Woodleaf Trust entered into Master Trading and Authorization Agreements with AIG, which authorized Sentinel to act on behalf of the Participants in dealings with AIG. In September of 1999, the Conjeevaram Trusts entered into similar Master Trading and Authorization Agreements with AIG, and on May 19, 2000, the Bergmann Family Trust, A.B.I.B., and the Puramsetti Trust also entered into such agreements with AIG.

The Agreements for the Bergmann Trust, Bergmann Family Trust, A.B.I.B., Pfeiffer Trust, and Puramsetti Trust each contained Paragraph 11.6, which provided: "Unless otherwise agreed, Counterpart shall, from time to time and as requested by AIG, pay to AIG a fee equal to 0.0275% multiplied by the notional amount of any Call spread or Put spread Option Transaction." JX 13, 17, 24, 26, 28.[3] The Agreements with the Woodleaf Trust and Conjeevaram Trusts did not include Paragraph 11.6 or similar language.

In 1999, each of the K2 Participants, with the exception of A.B.I.B., Puramsetti, and the Bergmann Family Trust, executed spread transactions with AIG. These Participants subsequently contributed those transactions to Asuma Trading Ventures, LLC ("Asuma"), in exchange for partnership interests in Asuma, and then withdrew from the partnership. Joint Stip. ¶¶ 69-73, 78-79. During the 1999, 2000, and 2001 tax years, the Asuma partners sold a portion of the assets received upon exiting the partnership, calculating the basis of these assets with respect to the purchased options only. Id. ¶ 81. By disregarding the sold options as contingent obligations, some or all of the Asuma partners claimed losses during the 1999, 2000, and 2001 tax years totaling over $36 million dollars. Id. The IRS subsequently issued to Asuma an FPAA with respect to Asuma's 1999 taxable year, which is currently the subject of litigation pending in the United States Tax Court (Docket No. 26772-06). Joint Stip. ¶ 191. As described by Plaintiff's counsel, the Asuma case "involves clearly similar facts" to those in this case, but "it is a case which, in contrast to K2 Trading, there were very significant tax benefits claimed." Tr.

---

[3] Paragraph 11.6 appeared in the original Master Trading Agreements for A.B.I.B., Bergmann Family Trust, and Puramsetti Trust. Paragraph 11.6 was added by amendment to the Master Trading Agreements for the Bergmann and Pfeiffer Trusts.

20.  The Tax Court has stayed proceedings in the Asuma case pending this Court's resolution of the instant action.

## Foreign Currency Options Later Contributed to K2 Trading

In 2000, Sentinel's leadership once again decided to use the spread transaction.  The K2 Participants executed additional trades with AIG on May 31, June 5, and June 7, 2000, roughly five months after Asuma dissolved.  Each Participant first bought and sold nearly identical call options for both the Euro and the British Pound.  For each currency spread, the sold call option had a strike price of 10 basis points, or "pips" (one-hundredth of one percent), higher than the strike price for the purchased option.  Although the trades had different notional amounts and strike prices, the spreads were similar in two crucial respects.  First, the Participants paid AIG only the net premium for the spreads, or the difference between the cost of the purchased option and the price of the sold option.  These net premiums represented fractions of the full premiums charged by AIG for the purchased call options.  Secondly, each Participant paid AIG a fee of roughly two pips of the notional amount of each spread.  Joint Stip. ¶ 94.

In a process known as "restriking," the Participants, with the exception of Puramsetti, later exchanged their call spreads for similar spreads with higher strike prices.  Like the other Participants, the Puramsetti Trust bought two 10-pip call spreads.  The Puramsetti Trust, however, did not restrike its positions.

### Bergmann Trust

On May 31, 2000, the Bergmann Trust purchased from AIG a European-style U.S. Dollar/Euro call option for a strike price of $0.9490 for a premium of $6,000,010 and sold to AIG a European–style U.S. Dollar/Euro call option at a strike price of $0.9500 for a premium of $5,945,404.  The same day, the Bergmann Trust also bought from AIG a European-style U.S. Dollar/British Pound call option at a strike price of $1.5050 for a premium of $18,000,006 and sold to AIG a European-style U.S. Dollar/British Pound call option at a strike price of $1.5060 for a premium of $17,846,051.

On June 7, 2000, the Bergmann Trust made the following trades.  First, it purchased from AIG a European-style U.S. Dollar/Euro call option at a strike price of $0.9500 for a premium of $6,946,402 and sold to AIG a European-style U.S. Dollar/Euro call option at a strike price of $0.9490 for a premium of $7,006,675.  Joint Stip. ¶ 97.  The same day, the Bergmann Trust purchased from AIG a European-style U.S. Dollar/British Pound call option at a strike price of $1.5060 for a premium of $21,786,943 and sold to AIG a European-style U.S. Dollar/British Pound call option at a strike price of $1.5050 for a premium of $21,962,724.  Additionally, it purchased from AIG a European-style U.S. Dollar/British Pound call option at a strike price of $1.5301 for a premium of $18,000,268 and sold to AIG a European-style U.S. Dollar/British Pound call option at a strike price of $1.5311 for a premium of $17,843,546.  Also, it purchased from AIG a European-style U.S. Dollar/Euro call option at a strike price of $0.9680 for a premium of $6,000,079 and sold to AIG a European-style U.S. Dollar/Euro call option at a strike price of $0.9690 for a premium of $5,945,538.

**Bergmann Family Trust**

On May 31, 2000, the Bergmann Family Trust purchased from AIG a European-style U.S. Dollar/Euro call option at a strike price of $0.9490 for a premium of $4,000,010 and sold to AIG a European-style U.S. Dollar/Euro call option at a strike price of $0.9500 for a premium of $3,963,606.  The same day, the Bergmann Family Trust purchased from AIG a European-style U.S. Dollar/British Pound call option at a strike price of $1.5050 for a premium of $12,000,004 and sold to AIG a European-style U.S. Dollar/British Pound call option at a strike price of $1.5060 for a premium of $11,897,367.

On June 7, 2000, the Bergmann Family Trust made the following trades.  First, it purchased from AIG a European-style U.S. Dollar/Euro call option at a strike price of $0.9500 for a premium of $4,630,939 and sold to AIG a European-style U.S. Dollar/Euro call option at a strike price of $0.9490 for a premium of $4,671,120.  That same day, the Bergmann Family Trust also bought from AIG a European-style U.S. Dollar/British Pound call option at a strike price of $1.5060 for a premium of $14,524,628 and sold to AIG a European-style U.S. Dollar/British Pound call option at a strike price of $1.5050 for a premium of $14,641,816.  It also purchased from AIG a European-style U.S. Dollar/Euro call option at a strike price of $0.9680 for a premium of $4,000,056 and sold to AIG a European-style U.S. Dollar/Euro call option at a strike price of $0.9690 for a premium of $3,963,695.  The Bergmann Family Trust additionally purchased from AIG a European-style U.S. Dollar/British Pound call option at a strike price of $1.5301 for a premium of $12,000,179 and sold to AIG a U.S. Dollar/British Pound call option at a strike price of $1.5311 for a premium of $11,895,697.

**A.B.I.B.**

On May 31, 2000, A.B.I.B. purchased from AIG a European-style U.S. Dollar/Euro call option at a strike price of $0.9490 for a premium of $8,750,010 and sold to AIG a European-style U.S. Dollar/Euro call option at a strike price of $0.9500 for a premium of $8,670,377.  The same day, A.B.I.B. purchased from AIG a European-style U.S. Dollar/British Pound call option at a strike price of $1.5050 for a premium of $26,249,998 and sold to AIG a European-style U.S. Dollar/British Pound call option at a strike price of $1.5060 for a premium of $26,025,480.

On June 7, 2000, A.B.I.B. made the following trades.  First, it purchased from AIG a European-style U.S. Dollar/Euro call option at a strike price of $0.9500 for a premium of $10,130,168 and sold to AIG a European-style U.S. Dollar/Euro call option at a strike price of $0.9490 for a premium of $10,218,065.  Also on that day, A.B.I.B. bought from AIG a European-style U.S. Dollar/British Pound call option at a strike price of $1.5060 for a premium of $31,772,611 and sold to AIG a European-style U.S. Dollar/British Pound call option at a strike price of $1.5050 for a premium of $32,028,959.  A.B.I.B. purchased from AIG a European-style U.S. Dollar/Euro call option at a strike price of $0.9680 for a premium of $8,750,114 and sold to AIG a European-style U.S. Dollar/Euro call option at a strike price of $0.9690 for a premium of $8,670,576.  A.B.I.B. also bought from AIG a European-style U.S. Dollar/British Pound call option at a strike price of $1.5301 for a premium of $26,250,381 and sold to AIG a European-style U.S. Dollar/British Pound call option at a strike price of $1.5311 for a premium of $26,021,827.

**Woodleaf Trust**

On May 31, 2000, the Woodleaf Trust purchased from AIG a European-style U.S. Dollar/Euro call option at a strike price of $0.9490 for a premium of $3,750,010 and sold to AIG a European-style U.S. Dollar/Euro call option at a strike price of $0.9500 for a premium of $3,715,881.  On that day, the Woodleaf Trust also bought from AIG a European-style U.S. Dollar/British Pound call option at a strike price of $1.5050 for a premium of $11,250,004 and sold to AIG a European-style U.S. Dollar/British Pound call option at a strike price of $1.5060 for a premium of $11,153,782.

On June 7, 2000, the Woodleaf Trust made the following trades.  First, it purchased from AIG a European-style U.S. Dollar/Euro call option at a strike price of $0.9500 for a premium of $4,341,506 and sold to AIG a European-style U.S. Dollar/Euro call option at a strike price of $0.9490 for a premium of $4,379,176.  Also on that day, the Woodleaf Trust purchased from AIG a European-style U.S. Dollar/British Pound call option at a strike price of $1.5060 for a premium of $13,616,839 and sold to AIG a European-style U.S. Dollar/British Pound call option at a strike price of $1.5050 for a premium of $13,726,702.  The Woodleaf Trust also purchased from AIG a European-style U.S. Dollar/Euro call option at a strike price of $0.9680 for a premium of $3,750,054 and sold to AIG a European-style U.S. Dollar/Euro call option at a strike price of $0.9690 for a premium of $3,715,966.  Additionally, the Woodleaf Trust purchased from AIG a European-style U.S. Dollar/British Pound call option at a strike price of $1.5301 for a premium of $11,250,167 and sold to AIG a U.S. Dollar/British Pound call option at a strike price of $1.5311 for a premium of $11,152,216.

**Pfeiffer Trust**

On May 31, 2000, the Pfeiffer Trust purchased from AIG a European-style U.S. Dollar/Euro call option at a strike price of $0.9490 for a premium of $2,500,010 and sold to AIG a European-style U.S. Dollar/Euro call option at a strike price of $0.9500 for a premium of $2,477,257.  The same day, it also bought from AIG a European-style U.S. Dollar/British Pound call option at a strike price of $1.5050 for a premium of $7,500,008 and sold to AIG a European-style U.S. Dollar/British Pound call option at a strike price of $1.5060 for a premium of $7,435,860.

On June 7, 2000, the Pfeiffer Trust made the following trades.  First, it purchased from AIG a European-style U.S. Dollar/Euro call option at a strike price of $0.9500 for a premium of $2,894,340 and sold to AIG a European-style U.S. Dollar/Euro call option at a strike price of $0.9490 for a premium of $2,919,453.  The Pfeiffer Trust bought from AIG a European-style U.S. Dollar/British Pound call option at a strike price of $1.5060 for a premium of $9,077,899 and sold to AIG a European-style U.S. Dollar/British Pound call option at a strike price of $1.5050 for a premium of $9,151,141 on that same day.  The Pfeiffer Trust also purchased from AIG a European-style U.S. Dollar/Euro call option at a strike price of $0.9680 for a premium of $2,500,037 and sold to AIG a European-style U.S. Dollar/Euro call option at a strike price of $0.9690 for a premium of $2,477,312.  In addition, the Pfeiffer Trust purchased from AIG a European-style U.S. Dollar/British Pound call option at a strike price of $1.5301 for a premium

of $7,500,117 and sold to AIG a European-style U.S. Dollar/British Pound call option at a strike price of $1.5311 for a premium of $7,434,816.

### Smita Conjeevaram Trust

On June 5, 2000, the Smita Conjeevaram Trust purchased from AIG a European-style U.S. Dollar/Euro call option at a strike price of $0.9550 for a premium of $1,250,006 and sold to AIG a European-style U.S. Dollar/Euro call option at a strike price of $0.9560 for a premium of $1,238,712. That same day, the trust purchased from AIG a European-style U.S. Dollar/British Pound call option at a strike price of $1.5120 for a premium of $3,750,009 and sold to AIG a European-style U.S. Dollar/British Pound call option at a strike price of $1.5130 for a premium of $3,718,632.

On June 7, 2000, the Smita Conjeevaram Trust made the following trades. First, it purchased from AIG a European-style U.S. Dollar/Euro call option at a strike price of $0.9560 for a premium of $1,479,371 and sold to AIG a European-style U.S. Dollar/Euro call option at a strike price of $0.9550 for a premium of $1,491,904. The Smita Conjeevaram Trust also bought from AIG a European-style U.S. Dollar/British Pound call option at a strike price of $1.5130 for a premium of $3,988,994 and sold to AIG a European-style U.S. Dollar/British Pound call option at a strike price of $1.5120 for a premium of $4,022,866. The Trust purchased from AIG a European-style U.S. Dollar/Euro call option at a strike price of $0.9753 for a premium of $1,250,113 and sold to AIG a European-style U.S. Dollar/Euro call option at a strike price of $0.9763 for a premium of $1,238,783. The Smita Conjeevaram Trust also purchased from AIG a European-style U.S. Dollar/British Pound call option at a strike price of $1.5200 for a premium of $3,750,081 and sold to AIG a European-style U.S. Dollar/British Pound call option at a strike price of $1.5210 for a premium of $3,717,547.

### Srini Conjeevaram Trust

On June 5, 2000, the Srini Conjeevaram Trust also purchased from AIG a European-style U.S. Dollar/Euro call option at a strike price of $0.9550 for a premium of $1,250,006 and sold to AIG a European-style U.S. Dollar/Euro call option at a strike price of $0.9560 for a premium of $1,238,712. That same day, the trust purchased from AIG a European-style U.S. Dollar/British Pound call option at a strike price of $1.5120 for a premium of $3,750,009 and sold to AIG a U.S. Dollar/British Pound call option at a strike price of $1.5130 for a premium of $3,718,632.

On June 7, 2000, the Srini Conjeevaram Trust made the following trades. First, it purchased from AIG a European-style U.S. Dollar/Euro call option at a strike price of $0.9560 for a premium of $1,479,371 and sold to AIG a European-style U.S. Dollar/Euro call option at a strike price of $0.9550 for a premium of $1,491,904. It also purchased from AIG a European-style U.S. Dollar/British Pound call option at a strike price of $1.5130 for a premium of $3,988,994 and sold to AIG a European-style U.S. Dollar/British Pound call option at a strike price of $1.5120 for a premium of $4,022,866. The Srini Conjeevaram Trust purchased from AIG a European-style U.S. Dollar/Euro call option at a strike price of $0.9753 for a premium of $1,250,113 and sold to AIG a European-style U.S. Dollar/Euro call option at a strike price of $0.9763 for a premium of $1,238,783. In addition, the Srini Conjeevaram Trust purchased from

AIG a European-style U.S. Dollar/British Pound call option at a strike price of $1.5200 for a premium of $3,750,081 and sold to AIG a European-style U.S. Dollar/British Pound call option at a strike price of $1.5210 for a premium of $3,717,547.

### Puramsetti Trust

On June 5, 2000, the Puramsetti Trust purchased from AIG a European-style U.S. Dollar/Euro call option at a strike price of $0.9550 for a premium of $2,500,012 and sold to AIG a European-style U.S. Dollar/Euro call option at a strike price of $0.9560 for a premium of $2,477,424.  The Puramsetti Trust purchased from AIG a European-style U.S. Dollar/British Pound call option at a strike price of $1.5120 for a premium of $2,500,006 and sold to AIG a European-style U.S. Dollar/British Pound call option at a strike price of $1.5130 for a premium of $2,479,088 that same day.

## K2's Formation and Capitalization

On July 19, 2000, the Participants formed K2 as a limited liability company under Delaware law.  New Vista, LLC served as K2's Tax Matters Partner and Managing Member and paid the law firm of Wolf, Block, Schorr, and Solis-Cohen, LLP $830 in connection with K2's formation.

Pursuant to assignment and assumption agreements entered into on July 24-25 and July 27, 2000, the Participants who restruck transferred their new spread transactions to K2, and Mr. Puramsetti, who did not restrike, contributed his original spread.  The Participants also contributed cash.  In exchange for these contributions to K2, each Participant received a partnership interest in K2 in the following amounts:  Bergmann Trust, 20.74 percent; A.B.I.B., 30.24 percent; Bergmann Family Trust, 13.83 percent; Pfeiffer Trust, 8.64 percent; Smita Conjeevaram Trust, 4.41 percent; Srini Conjeevaram Trust, 4.41 percent; Puramsetti Trust, 4.49 percent; and Woodleaf Trust, 13.25 percent.  JX 155.  In November of 2000, New Vista contributed $500 to K2 in exchange for a 0.12% ownership interest.

## Notice 2000-44

In August of 2000, the IRS issued Notice 2000-44, 2000-2 C.B. 255, which stated in pertinent part:

> In Notice 99-59, 1999-52 I.R.B. 761, the Internal Revenue Service and the Treasury Department described certain transactions that were being marketed to taxpayers for the purpose of generating artificial tax losses.  This notice concerns other similar transactions that purport to generate tax losses for taxpayers.

> As stated in Notice 99-59, a loss is allowable as a deduction for federal income tax purposes only if it is bona fide and reflects actual economic consequences.  An artificial loss lacking economic substance is not allowable . . . .

> Notice 99-59 describes an arrangement that purported to give rise to deductible losses on disposition of stock by applying the rules relating to distributions of

encumbered property to shareholders in order to create artificially high basis in the stock.   The Service and the Treasury have become aware of similar arrangements that have been designed to produce noneconomic tax losses on the disposition of partnership interests.   These arrangements purport to give taxpayers artificially high basis in partnership interests and thereby give rise to deductible losses on disposition of those partnership interests.

. . . .

In [one] variation, a taxpayer purchases and writes options and purports to create substantial positive basis in a partnership interest by transferring those option positions to a partnership.   For example, a taxpayer might purchase call options for a cost of $1,000X and simultaneously write offsetting call options, with a slightly higher strike price but the same expiration date, for a premium of slightly less than $1,000X.   Those option positions are then transferred to a partnership which, using additional amounts contributed to the partnership, may engage in investment activities.

Under the position advanced by the promoters of this arrangement, the taxpayer claims that the basis in the taxpayer's partnership interest is increased by the cost of the purchased call options but is not reduced under § 752 as a result of the partnership's assumption of the taxpayer's obligation with respect to the written call options.   Therefore, disregarding additional amounts contributed to the partnership, transaction costs, and any income realized and expenses incurred at the partnership level, the taxpayer purports to have a basis in the partnership interest equal to the cost of the purchased call options ($1,000X in this example), even though the taxpayer's net economic outlay to acquire the partnership interest and the value of the partnership interest are nominal or zero.   On the disposition of the partnership interest, the taxpayer claims a tax loss ($1,000X in this example), even though the taxpayer has incurred no corresponding economic loss.

The purported losses resulting from the transactions described above do not represent bona fide losses reflecting actual economic consequences as required for purposes of § 165.   The purported losses from these transactions (and from any similar arrangements designed to produce noneconomic tax losses by artificially overstating basis in partnership interests) are not allowable as deductions for federal income tax purposes . . . .

I.R.S. Notice 2000-44, 2000-2 C.B. 255 (internal citations omitted).

## K2's Dissolution

On December 12, 2000, the Puramsetti Trust withdrew from K2 and received €11,174 and 7,003 shares of Rare Medium Group, Inc. ("Rare Medium") stock in exchange for its interest in K2.

On April 18-19, 2001, the Bergmann Trust, Bergmann Family Trust, A.B.I.B., Pfeiffer Trust, Conjeevaram Trusts, and Woodleaf Trust sent letters to New Vista requesting withdrawal from K2.

On May 8, 2001, K2 closed out all of the spread positions that the Participants had contributed to K2. By this point, the Dollar had made gains against the Euro and the Pound, and the spreads had consequently lost 99.75% of their initial value. That same day, K2 purchased from AIG: (i) a European-style U.S. Dollar/Euro call option at a strike price of $0.9690 for a premium of $830, (ii) a European-style U.S. Dollar/Euro call option at a strike price of $0.9763 for a premium of $52, and (iii) a European-style U.S. Dollar/Euro call option at a strike price of $0.9560 for a premium of $118, and sold to AIG (i) a European-style U.S. Dollar/Euro call option at a strike price of $0.9680 for a premium of $1,880 (ii) a European-style U.S. Dollar/Euro call option at a strike price of $0.9753 for a premium of $160 and (iii) a European-style U.S. Dollar/Euro call option at a strike price of $0.9550 for a premium of $260. On that day, K2 also purchased from AIG: (i) a European-style U.S. Dollar/British Pound call option at a strike price of $1.5130 for a premium of $92, (ii) a European-style U.S. Dollar/British Pound call option at a strike price of $1.5210 for a premium of $88, and (iii) a European-style U.S. Dollar/British Pound call option at a strike price of $1.5311 for a premium of $1,100, and sold to AIG (i) a European-style U.S. Dollar/British Pound call option at a strike price of $1.5120 for a premium of $230, (ii) a European-style U.S. Dollar/British Pound call option at a strike price of $1.5200 for a premium of $200, and (iii) a European-style U.S. Dollar/British Pound call option at a strike price of $1.5301 for a premium of $2,150.

On September 12, 2001, MCS Management withdrew from K2. Upon withdrawal, the Participants received stock and/or currency in exchange for their interest in K2. As of the fall of 2001, each of the Participants had withdrawn from K2. On November 6, 2001, K2 was dissolved.

**Claimed Tax Losses Resulting From the Transaction**

On December 22, 2000, the Puramsetti Trust sold 578 shares of the Rare Medium stock that it had received in exchange for its interest in K2 and "reported a loss of $246,705 for the 2000 taxable year, in which the sold call options were disregarded as liabilities in the calculation of basis for federal income tax purposes." Joint Stip. ¶ 166. On November 3, 2004, the Puramsetti Trust sold 642 shares of Skyterra Communications, Inc. stock (Rare Medium's successor), received in distribution from K2 Trading, for $6,207 and claimed a loss of $7,852 for tax year 2004. "The basis used for calculating this loss was the fair market value of the stock as of the date of distribution from K2 Trading, rather than a basis computed by disregarding the short options as liabilities for federal income tax purposes." Joint Stip. ¶ 184.

In December of 2001, the Pfeiffer Trust sold a portion of the British Pounds currency received in distribution from K2 for $58. "In reporting such sale, both the purchased and sold call options were taken into account in determining the tax basis for federal income tax purposes." Joint Stip. ¶ 182. On December 26, 2002, the Smita Conjeevaram Trust sold 10 shares of Conexant stock for $15. Both the bought and sold call options were taken into account when determining the tax basis for federal income tax purposes. No tax losses were reported as a result of these sales.

Aside from the dispositions described above, "none of the Participants have disposed of any assets received in distribution of their interests in K2 Trading nor have any such Participants reported any tax benefits related thereto on any federal income tax return."  Joint Stip. ¶ 185. "The estimated amount of tax basis in assets received in distribution by the Participants from K2 Trading, computed based on disregarding the sold call options as liabilities, is $115 million and is in dispute between the parties."  Joint Stip. ¶ 186.

## Notices of Final Partnership Administrative Adjustments

K2 filed partnership tax returns for tax years 2000 and 2001.  On April 13, 2004, the IRS issued to K2 an FPAA for tax year 2000 ("2000 FPAA"), and on August 9, 2005, issued an FPAA for tax year 2001 ("2001 FPAA").

The 2000 FPAA stated in pertinent part:

1. It is determined that K2 Trading Ventures LLC was a sham, lacked economic substance or, under §1-701-1 of the Income Tax Regulations, was formed or availed of in connection with a transaction or transactions in taxable year 2000, a principal purpose of which was to reduce substantially the present value of its partners' aggregate federal tax liability in a manner that is inconsistent with the intent of Subchapter K of the Internal Revenue Code.  It is consequently determined said partnership is disregarded and that all transactions engaged in by K2 Trading Ventures LLC are treated as engaged in directly by its purported partners:  A.B.I.B. Family Partners Ltd., Abraham J. Pfeiffer Revocable Trust, MCS Asset Management, New Vista LLC, Smita Conjeevaram Revocable Trust, Srini Conjeevaram Revocable Trust, Udai K. Puramsetti 1999 Revocable Trust, and Woodleaf Trust.  This includes the determination that the assets purportedly acquired by K2 Trading Ventures, LLC, including but not limited to British Pound and Euro foreign currency options, were acquired directly by the purported partners. . . .

2. It is determined that, under § 1.701-2 of the Income Tax Regulations, the British Pound and Euro foreign currency options, purportedly contributed to or assumed by K2 Trading Ventures LLC, are treated as never having been contributed to or assumed by said partnership and any gains or losses purportedly realized by K2 Trading Ventures LLC on the options are treated as having been realized by its partners.

3. It is further determined that, under § 1.701-2 of the Income Tax Regulations, the purported partners of K2 Trading Ventures LLC should be treated as not being partners in K2 Trading Ventures LLC.

4. It is further determined that, under § 1.701-2 of the Income Tax Regulations, contributions to K2 Trading Ventures LLC will be adjusted to reflect clearly the partnership's or purported partners' income.

5. It is determined that the obligations under the written call options sold are liabilities within the meaning of Section 752 of the Internal Revenue Code,

the assumption of which by K2 Trading ventures LLC is treated as a distribution of money to its partners . . . and a reduction in such partners' bases in K2 Trading Ventures LLC . . . [in] the [respective] amounts of the British Pound and Euro call options.

6. It is determined that K2 Trading Ventures LLC did not enter into the options positions or purchase the foreign currency or stock with a profit motive for purposes of § 165(c)(2).

7. It is determined that, even if the British Pound and Euro foreign currency options are treated as having been contributed to K2 Trading Ventures LLC, the amount treated as contributed by the partners under section 722 of the Internal Revenue Code is reduced by the amounts received by its contributing partners . . . from the contemporaneous sales of the call options to the same counter-party, AIG International.  Thus, the bases of the contributed options are reduced, both in the hands of the contributing partners and K2 Trading Ventures LLC . . . respectively.  Consequently, any corresponding claimed increases in the outside bases in K2 Trading Ventures LLC resulting from the contributions of the British Pound and Euro foreign currency options are disallowed.

JX 178.  The IRS adjusted the outside partnership basis in K2 from $115,106,870.49 to $0 for tax year 2000.

The 2001 FPAA stated in relevant part:

1. It is determined that neither K2 Trading Ventures LLC nor its purported partners . . . have established the existence of K2 Trading Ventures LLC as a partnership as a matter of fact.

2. Even if K2 Trading Ventures LLC existed as a partnership, this purported partnership was formed and/or availed of solely for purposes of tax avoidance by artificially overstating basis in the partnership interests of its purported partners . . . .  The formation of K2 Trading Ventures LLC, the acquisition of any interest in the purported partnership by its purported partners, the purchase of offsetting British Pound and Euros foreign currency options, the transfer of offsetting British Pound and Euros foreign currency options to the partnership in return for partnership interests, the purchase of assets by the partnership, the distribution of those assets to its purported partners in complete liquidation of the partnership interests, and the subsequent sale of those assets to generate losses had no business purpose, lacked economic substance, and, in fact and substance, constitutes an economic sham for federal income tax purposes. Accordingly, the partnership and the transactions described above shall be disregarded in full and any purported losses resulting from these transactions are not allowable as deductions for federal income tax purposes.

3.  It is determined that K2 Trading Ventures LLC was a sham, lacked economic substance and, under § 1.701-2 of the Income Tax Regulations, was formed and/or availed of in connection with a transaction or transactions in taxable year ending November 1, 2001, a principal purpose of which was to reduce substantially the present value of its partners' aggregate federal tax liability in a manner that is inconsistent with the intent of Subchapter K of the Internal Revenue Code.  It is consequently determined that:

   A.  K2 Trading Ventures LLC is disregarded and all transactions engaged in by this purported partnership are treated as engaged in directly by its purported partners . . . . This includes the determination that the assets purportedly acquired by K2 Trading Ventures LLC, including but not limited to British Pound and Euros foreign currency options, were acquired directly by its purported partners.

   B.  the British Pound and Euros foreign currency options, purportedly contributed to or assumed by K2 Trading Ventures LLC, are treated as never having been contributed to or assumed by said partnership and any gains or losses purportedly realized by K2 Trading Ventures LLC on the options are treated as having been realized by its partners.

   C.  the purported partners of K2 Trading Ventures LLC should be treated as not being partners in K2 Trading Ventures LLC.

   D.  contributions to K2 Trading Ventures LLC will be adjusted to reflect clearly the partnership's or purported partners' income.

4.  It is determined that the obligations under the short positions (written call options) transferred to K2 Trading Ventures LLC by its purported partners . . . constitute liabilities for purposes of Treasury Regulation § 1.752-6T, the assumption of which by K2 Trading Ventures LLC shall reduce the purported partners' bases in K2 Trading Ventures LLC in the amounts of $26,021,827.58 (British Pounds) and $8,670,575.89 (Euros), $7,434,816.44 (British Pounds) and $2,477,312.47 (Euros), $17,843,546.37 (British Pounds) and $5,945,538.79 (Euros), $3,963,695.90 (British Pounds) and $11,895,697.58 (Euros), $3,717,547.70 (British Pounds) and $1,238,783.14 (Euros), $3,717,547.70 (British Pounds) and $1,238,783.14 (Euros), and $11,152,216.50 (British Pounds) and $3,715,966.21 (Euros), respectively, the amounts of the British Pound and Euro call options, but not below the fair market value of the purported partnership interests.

5.  It is determined that neither K2 Trading Ventures LLC nor its purported partners entered into or acquired the British Pound and Euros foreign currency options positions or purchased or acquired the foreign currency or stock with a profit motive for purposes of § 165(c)(2).

6.  It is determined that, even if the British Pound and Euro foreign currency options are treated as having been contributed to K2 Trading Ventures LLC, the amount treated as contributed by its partners under section 722 of the Internal Revenue Code is reduced by the amounts received by the contributing partners . . . from the contemporaneous sales of the call options(s) to the same counter-party, AIG International.  Thus, the bases of the contributing options are reduced, both in the hands of the contributing partners and K2 Trading Ventures LLC . . . respectively.  Consequently, any corresponding claimed increases in the outside basis in K2 Trading Ventures LLC resulting from the contributions of the foreign currency option(s) are disallowed.

7.  It is determined that the adjusted bases of the long call positions (purchased call options) and other contributions purportedly contributed to K2 Trading Ventures LLC by its purported partners have not been established under I.R.C. § 723.  It is consequently determined that the partners of K2 Trading Ventures LLC have not established adjusted bases in their respective partnership interests in an amount greater than zero . . . .

8.  It is further determined that the ordinary loss from I.R.C. § 988 transactions of $1,006,789 claimed by K2 Trading Ventures LLC concerning the closing of the foreign currency options for the taxable year ending November 1, 2001 is disallowed as it has not been established that such loss was incurred and is deductible under any provision of the Internal Revenue Code, including, but not limited to, I.R.C. § 165.

9.  It is further determined that the deduction for operating expenses claimed by K2 Trading Ventures LLC in the amount of $10,030 for the taxable year ending November 1, 2001 is disallowed as it has not been established that such expenses were incurred and are deductible under any provision of the Internal Revenue Code, including, but not limited to I.R.C. §§ 162 and 165.

JX 179.  The IRS adjusted the outside partnership basis in K2 from $110,001,843.60 to $0.

K2, through its Tax Matters partner, New Vista, filed complaints challenging the two FPAAs, seeking a readjustment of the partnership items in the FPAAs.

By agreement of the parties, the Court held a trial for the limited purpose of adjudicating two issues: (1) the application of the objective component of the economic substance doctrine as defined in Coltec Industries, Inc. v. United States, 454 F.3d 1340 (Fed. Cir. 2006); and (2) the application of Treas. Reg. § 1.752-6, a 2003 regulation purporting to retroactively change outside basis when a partnership assumes a partner's "fixed or contingent obligation to make payment." The parties offered the testimony of three experts on the application of the economic substance doctrine.

Plaintiff called Dr. Nassim Taleb as an expert in foreign currency, options trading, and risk management, who testified that the Participants' spread transactions exhibited several characteristics of a bona fide trading strategy.  Dr. Taleb testified that the K2 Participants' trades

were potentially profitable because the Participants had a "dynamic" view of trading and of profit potential, i.e., they were prepared to actively trade their positions prior to maturity. Tr. 124-26, 264-65. According to Dr. Taleb, the maximum profit potential of options traded on a dynamic basis is unknown because profit varies with the movement of the underlying currency between the initial trade date and its nominal maturity, as well as the trading strategy and perspective of the options' holder. Tr. 124, 213-14. Dr. Taleb testified that the K2 Participants could have effectuated a dynamic trading strategy by restriking their options with limited transaction costs, Tr. 161-62, such that the Participants had a reasonable expectation of indeterminably large profit. Tr. 180-82. Additionally, Dr. Taleb opined that the Participants gained advantages by contributing their spreads to the Partnership, specifically diversification, Tr. 182-84, and centralized management. Tr. 256.

Defendant offered the testimony of Dr. David DeRosa, an expert in economics and finance, foreign exchange, options on foreign exchange, derivative trading and derivative risk measurement and management, and of Dr. Lawrence Kolbe, an expert in financial economics, economics, risk return, valuation, including investment and leverage, and capital market principles. Both Dr. DeRosa and Dr. Kolbe testified that the spread transactions contributed to K2 were abnormal and had a limited potential for profit. Dr. DeRosa testified that the structure of the Participants' transaction, specifically the narrow spread between the purchased and sold options, was unusual. Tr. 408. In addition, Dr. DeRosa testified that the spread transactions' potential for real profit was hindered by the AIG fee, which Dr. DeRosa described as both unusually large and imprecise. Tr. 400-17, 448-49. Dr. Kolbe testified that the spread transactions' "expected profit," or the statistical mean of possible returns net of fees and transaction costs, was "materially negative." Tr. 761. Both Dr. DeRosa and Dr. Kolbe further testified that restriking would not affect the spread transactions' expected return, Tr. 418-19, 585-86, 89, and that transferring the options to the K2 partnership did not appreciably affect the value of the options. Tr. 459-60, 732-34.

## Discussion

## Jurisdiction

This Court has "jurisdiction to hear and to render judgment upon any petition under section 6226 . . . of the Internal Revenue Code." 28 U.S.C. § 1508; see Marriott Int'l Resorts, L.P. v. United States, 586 F.3d 962, 968 (Fed. Cir. 2009). Section 6226(f) grants this Court:

> jurisdiction to determine all partnership items of the partnership for the partnership taxable year to which the notice of final partnership administrative adjustment relates, the proper allocation of such items among the partners, and the applicability of any penalty, addition to tax, or additional amount which relates to an adjustment to a partnership item.[4]

---

[4] Unless indicated otherwise, all subsequent short form citations to the United States Code refer to Title 26 as codified in the relevant time period.

Plaintiff brings this partnership tax refund action seeking judicial review of the FPAAs that adjusted K2's partnership items relating to the spread transaction. The Court's jurisdiction over partnership items is detailed in the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA") 26 U.S.C. §§ 6221 et seq. TEFRA provides a method of uniformly adjusting items of partnership income, loss, deduction, or credit that affect each partner. While partnerships themselves do not pay federal income taxes, TEFRA requires a partnership to file an annual information return that reports its partners' distributive shares of income, gains, deductions, and credits. Partners are individually responsible for reporting their pro rata share of tax on their personal income tax returns.

Because the matters addressed in the K2 FPAAs are partnership items and must be determined at the partnership level, this Court has jurisdiction to determine the tax treatment of those items. Crnkovich v. United States, 202 F.3d 1325, 1329 (Fed. Cir. 2000) (per curiam). This Court makes a de novo determination regarding partnership items of K2 that were adjusted by the FPAA.

**The Code**

Here, as in Jade Trading, Plaintiff claims that the partners' bases in their partnership interests increased by the value of the purchased option but did not decrease by the value of the sold option assumed by the partnership. Section 722 addresses partnership basis, stating:

> The basis of an interest in a partnership acquired by a contribution of property, including money, to the partnership shall be the amount of such money and the adjusted basis of such property to the contributing partner at the time of the contribution . . . .

At issue here is whether Puramsetti was required to reduce its basis in its partnership interest by the sold option assumed by K2, or whether this type of "liability" was too uncertain to fit within the parameters of a "liability" within the meaning of section 752. The statute itself does not define liability. Section 752(b) states:

> Any decrease in a partner's share of the liabilities of a partnership, or any decrease in a partner's individual liabilities by reason of the assumption by the partnership of such individual liabilities, shall be considered as a distribution of money to the partner by the partnership.

In claiming tax benefits, Plaintiff treats the sold options assumed by K2 as contingent obligations, not liabilities, for purposes of lowering the basis in Puramsetti's partnership interests under section 752(b). As noted in Jade Trading, earlier interpretations of the Code suggested that the sold call option contributed to the partnership would not be considered a liability for purposes of section 752, and that the inflated basis resulting from the contribution of the spread transaction to the partnership complied with section 752. Nonetheless, under Coltec, such compliance with the Code is insufficient in and of itself for Puramsetti to reap the tax benefits claimed here. 454 F.3d at 1354. Rather, the transaction must also meet the objective economic substance test.

17

**The Economic Substance Doctrine**

In Coltec, the Federal Circuit affirmed the continued vitality of the economic substance doctrine, disregarding a transaction that literally complied with the Code but that lacked economic substance.  As the Federal Circuit explained, "[f]rom its inception, the economic substance doctrine has been used to prevent taxpayers from subverting the legislative purpose of the tax code by engaging in transactions that are fictitious or lack economic reality simply to reap a tax benefit."  Coltec, 454 F.3d at 1353-54.  "Under this doctrine, [the Court] disregard[s] the tax consequences of transactions that comply with the literal terms of the tax code, but nonetheless lack 'economic reality.'  Such transactions include those that have no business purpose beyond reducing or avoiding taxes, regardless of whether the taxpayer's subjective motivation was tax avoidance."  Stobie Creek, 608 F.3d at 1375 (citations omitted).  The Court also disregards "transactions shaped solely by tax-avoidance features."  Id.

In Coltec, the Federal Circuit articulated five key principles incorporated in the economic substance doctrine:

(1) the transaction to be analyzed is the one that gave rise to the alleged tax benefit;

(2) the transaction cannot lack economic reality (i.e., a bona fide business purpose or function besides mere tax avoidance);

(3) the taxpayer bears the burden of proving that the transaction has economic substance by a preponderance of the evidence;

(4) the economic substance of a transaction must be viewed objectively rather than subjectively; and

(5) arrangements with subsidiaries that do not affect the economic interests of independent third parties deserve particularly close scrutiny.

Coltec, 454 F.3d at 1355-57; see also Jade Trading II, 598 F.3d at 1376.

Here, the transactions to be analyzed are the K2 Participants' spread transactions and contribution to K2, as this combination of events led to the inflated basis disallowed by the FPAAs.  See JX 178; Jade Trading II, 598 F.3d at 1377-78; Coltec, 454 F.3d at 1356.

With respect to Coltec's fourth principle -- that the economic substance of a transaction must be viewed objectively rather than subjectively -- the inquiry is not whether the Participants believed the spread contribution was a real investment, but whether the transaction was a real investment.  Jade Trading II, 598 F.3d at 1377-78.  Whether a transaction has objective economic substance must be evaluated based upon the information available to a prudent investor at the time of the transaction.  Stobie Creek, 608 F.3d at 1375 (citing Coltec, 454 F.3d at 1356).

**The Spread Transactions Were Devoid of Economic Substance**

Plaintiff has not met its burden of proving that the spread transactions contributed to K2 had economic substance by a preponderance of the evidence. Even assuming that the transactions had a potential for profit, this potential does not outweigh the other evidence of record demonstrating that the tax effects of the transaction were entirely fictional, and the K2 partnership was formed not as a legitimate investment vehicle, but as a mechanism for generating inflated basis.

**The Transaction Led to Purely Fictional Tax Losses**

In Jade Trading II and Stobie Creek, the Federal Circuit held that spread transactions like those contributed to K2 lacked economic reality. In both cases, the Federal Circuit emphasized that the claimed tax effects in each case were fictional. In Jade Trading II, the members in the relevant partnership contributed both purchased and sold call options with premia of $15 million each, paid a small net premium for this spread, and subsequently claimed losses equal to the premium of the purchased call option. But as the Federal Circuit noted, "[e]ach [member] did not invest $15 million in the spread transaction contributed to Jade and did not lose almost $15 million upon exiting Jade . . . . [E]ach [member] had a real loss of . . . the difference between its capital contribution . . . to the Jade partnership and its redemption proceeds." Jade Trading II, 598 F.3d at 1377. The Federal Circuit therefore characterized the claimed losses as "purely fictional" and held that the transactions lacked economic substance. Id.

Similarly, the Federal Circuit in Stobie Creek considered spread transactions involving Foreign Exchange Digital Options ("FXDOTs") with premia of over $200 million, later redeemed for Therma-Tru stock. The Federal Circuit also characterized these transactions as leading to purely fictional tax effects and as lacking economic substance, stating:

> [T]he $204,575,000 stepped-up basis in the Therma-Tru stock was purely fictional: although the taxpayers only paid (and lost) about $2 million for the FXDOTs, they claimed a basis of over $200 million in their partnership interests, based on the contribution of those FXDOTS to Stobie Creek. It is true that the taxpayers did purchase and contribute long options with a stated premium of $204,575,000 to Stobie Creek. However, they also sold and contributed short options with a stated premium of $202,529,250. Even though a literal application of the tax code at that time may have permitted the taxpayers to treat these transactions separately, what matters under the economic substance doctrine is whether the tax treatment accords with economic reality. . . . Accordingly, the taxpayers' claimed basis of $204,575,000 is properly disregarded as lacking economic reality; it does not reflect what the taxpayers paid Deutsche Bank for the FXDOTs ($2,045,757), or what they lost when the FXDOTs expired out of the money.

Stobie Creek, 608 F.3d at 1377-78.

As in Jade Trading II and Stobie Creek, the transaction before this court generated tax effects that were purely fictional. The Puramsetti Trust purchased from AIG a European-style U.S. Dollar/Euro call option at a strike price of $0.9550 for a premium of $2,500,012, and sold to

AIG a European-style U.S. Dollar/Euro call option at a strike price of $0.9560 for a premium of $2,477,424 on June 5, 2000.  On the same day, the Puramsetti Trust purchased from AIG a European-style U.S. Dollar/British Pound call option at a strike price of $1.5120 for a premium of $2,500,006 and sold to AIG a European-style U.S. Dollar/British Pound call option at a strike price of $1.5130 for a premium of $2,479,088.  The Puramsetti Trust paid AIG net premia of roughly $44,000 in connection with the June 5 trades.  Joint Stip. ¶ 94; JX 78.  The Puramsetti Trust later contributed the options to K2, along with $4,030 in cash, in order to receive a 4.49 percent partnership interest in K2.  Joint Stip. ¶¶ 158-59; JX 155.  The Puramsetti Trust withdrew from K2 on December 12, 2000, receiving €11,174 and 7,003 shares of Rare Medium Group, Inc. stock in exchange for its partnership interest.  JX 162.  On December 22, 2000, the Puramsetti Trust sold 578 shares of the Rare Medium stock that it had received in exchange for its interest in K2 and "reported a loss of $246,705 for the 2000 taxable year, in which the sold call options were disregarded as liabilities in the calculation of basis for federal income tax purposes."  Joint Stip. ¶ 166; JX 239.  However, Puramsetti did not invest $246,705, and did not suffer a loss in that amount.  The losses Puramsetti claimed do not reflect economic reality.

## The Contribution of the Spreads to K2 was Meaningless

"[M]eaningless inclusion in a partnership" is another factor indicating that the spread transaction objectively lacked economic substance.  Jade Trading II, 598 F.3d at 1377; Stobie Creek, 608 F.3d at 1379.  In concluding that the transaction at issue in Jade Trading lacked economic substance, the Federal Circuit explained that creation of the Jade partnership -- and the contribution of options to that partnership -- did not "enhance the investment potential of the spread transaction . . . [but] was imperative . . . to generate the artificially inflated bases."  Jade Trading II, 598 F.3d at 1377.

Here, Plaintiff contends that contribution of the spread options to K2 appreciably affected the Participants' economic position by offering the benefits of diversification and centralized management.  Pl.'s Post-Trial Br. 29-32.  According to Plaintiff, "contribution and assignment of the positions to K2 Trading allowed the investors to diversify their portfolio by obtaining an interest in call spread options positions with varying strike prices and thus appreciably affected the investors' beneficial interests."  Id. at 6.

The Government counters that formation of and contribution to K2 did nothing but create the Participants' claim "to a hugely inflated, artificial tax basis in their partnership interest, the transfer of that basis to assets received when they redeemed their partnership interest, and to enormous tax losses when the assets are sold to shelter other income."  Def.'s Post-Trial Br. 30.  The Government also argues that K2's creation generated an unnecessary transaction cost, since the spread positions were not traded after contribution and were closed out at a near total loss.  Id. at 31; see also Tr. 462; Tr. 560 ("[T]he options were closed out at a loss of about 99.75 percent of their initial value."); Tr. 732-33.  The Government points out that creating the K2 partnership cost at least $830 in legal fees and presumably additional miscellaneous costs, such as set-up, bookkeeping, and preparing financial statements, as well.  Joint Stip. ¶ 142.

The weight of the evidence and the persuasiveness of Defendant's expert opinions contravene Plaintiff's assertion that contributing options to the K2 partnership appreciably benefited the Participants by providing diversification and centralized management.  Dr. DeRosa

testified that the Participants' decision to pool their assets in the K2 partnership did not achieve any appreciable benefit from diversification because the bulk of the trades were identical.  Tr. 459-61.  As he explained, diversification was "minimal because most of these guys had the same trade on anyway."  Tr. 459.  Dr. Kolbe agreed, testifying that spreads having different strike prices constituted less than 12% of the British Pound spreads and less than 17% of the Euro spreads.  Tr. 729-32.  Dr. DeRosa also emphasized that it would have been possible for any one of the Participants to achieve the same minimal diversification in his or her portfolio by "mak[ing] a miniature version of K2 any time they wanted" at no additional cost.  Tr. 461.  As such, he opined that "there's no advantage [to pooling their assets in the partnership]. . . . [The Participants] didn't need to go to K2."  Id.

Although Dr. Taleb testified that diversification offered a gain, he could not opine on its magnitude.  Tr. 183-84.  Rather, Dr. Taleb testified, "there is a gain from diversification . . . [but] I don't know how much."  Id.

According to Dr. DeRosa, moreover, the Participants did not have to join K2 to enjoy the purported benefit of centralized management.  Tr. 462.  In fact, Dr. DeRosa saw no benefit of centralized management and questioned whether centralized management even existed because "K2 rode the options into the ground.  They didn't do anything.  There was no trading.  There was nothing going on."  Tr. 462; see also Tr. 732-33 (testifying that after the options were contributed to K2, they "were never traded again, they weren't reversed, they weren't restruck, nothing happened.").  Dr. Kolbe agreed, remarking, "to the extent there's official centralized control that didn't exist before [contribution to the partnership], when you put them into K2, there's no evidence from what actually happened that it was of any benefit."  Tr. 732.

In contrast to the lack of benefit the partnership vehicle offered for investment purposes, the creation and structure of the partnership and the contribution of the spreads to that entity were "imperative" to generate the artificially inflated basis.  Jade Trading II, 598 F.3d at 1377.  Plaintiff's expert declined to testify about the tax implications of the spread transaction.  As Dr. Taleb explained, he "wanted to be not involved in knowing anything, so I'm making a decision on the economic aspect of the transaction regardless of whatever tax windfall or not windfall is there.  So I'm not involved in the tax aspect."  Tr. 222.

## The Potential for Profit Does Not Imbue the Transactions with Economic Substance

Plaintiff seeks to distance itself from the outcome in Jade Trading II, which invalidated a substantially similar spread transaction, by focusing myopically on the spread transactions' potential for profit.  The parties agree that, unlike the transactions in Jade Trading, the transactions at issue here might have turned a profit even net of the costs of premia and fees.  In Plaintiff's view, because the spread transactions may have been profitable, the transactions had economic substance.

Refocusing the economic substance inquiry solely on profit potential, however, does not alter the spread transaction's essence as an asset with low value, high basis, and fictional tax losses.  The objective economic substance test requires that a taxpayer prove a transaction had a realistic financial benefit beyond tax avoidance.  Coltec, 454 F.3d at 1356 n.16.  While lack of reasonable profit-making potential is one indicator that a transaction does not possess economic

substance, Stobie Creek, 608 F.3d at 1378, potential for profit does not in and of itself establish economic substance -- especially where the profit potential is dwarfed by tax benefits.  As the Federal Circuit noted in Jade Trading II, a "disproportionate tax advantage as compared to the amount invested and potential return[] compel[s] a conclusion that the spread transaction objectively lacked economic substance."  598 F.3d at 1377.

### The Spreads' Potential for Profit Under a Static Strategy

The potential returns here were grossly disproportionate to the tax benefits of the transactions, even assuming the highest potential profitability.  The June 7 Pound spread held by A.B.I.B., for instance, might have generated at most $202,054 in profits net of fees and premium.  The corresponding tax benefit for A.B.I.B., however, would have been an inflated basis of some $26 million -- the value of the purchased call option.  Def.'s Ex. 1 at 42.  In a similar vien, the Puramsetti Trust stood to gain at most $14,763 from its pound spread and $15,938 from its Euro spread but claimed a tax loss of $246,705 when selling a portion of the assets received upon exiting K2.  Def.'s Ex. 1 at 41, 45.[5]  The high ratio of tax benefits to maximum potential profit indicates that the transactions were designed only to produce disproportionate tax benefits.  In Sala v. United States, 613 F.3d 1249 (10th Cir. 2010), a functionally similar spread transaction stood to gain at most $550,000 over one year, but generated tax benefits of almost $24 million.  The "expected tax benefit [dwarfed] any potential gain from [the transaction] such that 'the economic [realities] of [the] transaction [were] insignificant in relation to the tax benefits of the transaction.'"  Id. at 1254 (quoting Rogers v. United States, 281 F.3d 1108, 1116 (10th Cir. 2002)).  So too, the potential profit of the K2 spread transactions, dwarfed by their attendant tax benefits, cannot endow the transactions with economic substance.

### The Spreads' Potential for Profit Under a Dynamic Strategy

Plaintiff contends that the K2 Participants could have reasonably anticipated earning even more by repeatedly restriking their spreads.  A reasonable expectation of profit earned by "dynamic" trading, according to Plaintiff, is further evidence that the spread transactions possessed economic substance here.

Restriking allows a trader to create a new spread position with new strike prices while retaining portions of the initial trade's strategy (such as notional amount and maturity).  Tr. 126-27, 131, 135, 141, 413, 415, 419.  As Dr. DeRosa explained, the "essence of [restriking] is that each time you do a restrike . . . you sell the original option that you're long and you buy an option that you were short so that you undo the trades by doing a new set of trades, and then you

---

[5] These numbers incorporate Dr. DeRosa's calculations of maximum potential returns net of fees and premia.  The experts agreed that the upfront fees paid to AIG must be accounted for in any estimation of potential profit, and Dr. Taleb and Dr. DeRosa each accounted for the fees by apportioning them among each of the Participants' various trades, including restrikes.  Tr. 237, 405, 571.  Because Dr. Taleb testified that the number of potential restrikes was uncertain, however, he did not provide specific examples of potential returns net of fees.  Tr. 237-39.  Only Dr. DeRosa provided specific estimates of returns for each Participant.

buy the new spread." Tr. 413.  Where the long option is in the money at the time of the restrike, the restriking investor receives a cash settlement.

In restriking, the option-holder normally incurs additional fees in the form of bid-ask spreads, or the difference between the fair market value of an option and what a dealer actually charges an investor-client.  Tr. 150-54.  Here, however, the experts agree that there were no bid-ask spreads embedded in the premia of the original or the restruck options.  Tr. 153, 470, 777. Plaintiff therefore extrapolates that the Participants' Master Trading Agreements with AIG, in conjunction with the up-front fee to AIG, allowed the Participants several -- if not unlimited -- restriking opportunities without fees.  In Plaintiff's view, with each restrike, a Participant could have received a cash payment, which, when added to an ostensibly profitable spread at maturity, could have multiplied each Participant's total profit.  However, Plaintiff's assumption that the Participants could have restruck repeatedly and at low cost is not supported by the Master Trading Agreements or the record as a whole.

Defendant posits that restriking did not actually increase the spread transactions' profit potential.  According to Defendant's experts, restruck options are inherently less valuable because the new options have higher strike prices.  Tr. 541-42; Tr. 586-88.  For the new options to expire in-the-money, the foreign currency must move progressively higher against the dollar, a movement that becomes more unlikely as strike prices rise.  In practice, this meant AIG's cash settlements with the Participants following restrikes merely compensated, but did not enrich, the Participants in exchange for a new spread that was less likely to expire in the money.  Restriking was essentially like moving money from "one pocket" (the valuable, in-the-money spread transaction) into another (a cash settlement and a less valuable spread transaction).  Tr. 415-16.

Ultimately, Plaintiff has not shown that the potential for restriking would have appreciably altered the spreads' profit potential or, consequently, the spreads' economic substance.  Plaintiff's theory about the transactions' enhanced potential profit from dynamic trading is overly speculative.  Plaintiff's argument, relying heavily on the testimony of Dr. Taleb, is essentially that dynamic trading is dependent on market conditions and investor psychology, making payoffs uncertain.  Uncertain payoffs, in turn, imply an indeterminate possibility of large payoffs (and, conversely, no payoffs).  Because the spread transactions were part of a dynamic trading strategy, Plaintiff argues, they had at least some chance for incredibly large profits.  See Pl.'s Post-Trial Brief at 11; Tr. 128 (quoting Dr. Taleb) ("So we don't know the upper bound. There is no fixed upper bound, you see.  I don't know where the upper bound is.  Different environment deliver upper bounds, you see.").

Under the economic substance doctrine, Plaintiff must show that there was some reasonable potential for profit, and speculation about potential unbounded profits does not suffice.  Plaintiff does not meet its burden simply by pointing out that there was a theoretical "non-zero" chance of indeterminably large profits.  In cases where courts have found that profit potential indicated economic substance, there has been clear evidence that the challenged transactions were reasonable bets, even though the transactions were risky.  See, e.g., Southgate Master Fund, L.L.C. ex rel. Montgomery Capital Advisors, LLC v. United States, 659 F.3d 466, 481 (5th Cir. 2011) (finding that acquisition of a portfolio of non-performing Chinese loans, though ultimately unprofitable, nonetheless possessed economic substance because at the time of

purchase "the available market intelligence and valuation data strongly indicated that the emerging market in Chinese [non-performing loans] held significant profit potential").  In this case, however, Plaintiff has offered only an undefined possibility for meaningful profits, without showing that any particular bet on currency rates had a realistic possibility of significant gain.  In any event, as explained above, potential profitability cannot be viewed in isolation from the magnitude of tax benefits generated.

### Conclusion

In sum, the possibility of substantial payoffs cannot cloak this type of transaction in legitimacy when all other characteristics of the transaction duplicate the elements of the tax shelter disallowed in Jade Trading.  Importantly, profit potential is only one of several factors indicating economic substance.  Here, the transactions exhibit the same critical attributes which defined this strategy as a tax avoidance mechanism in Jade Trading: a fictional loss, a meaningless contribution to a partnership, and a disproportionate tax advantage as compared to the amount invested and potential return.  Jade Trading II, 598 F.3d at 1377.  On the opposite side of the ledger, Plaintiff has shown only highly speculative profit from a dynamic trading strategy and profit arising from a static trading strategy, that was dwarfed by tax benefits.  As the Tenth Circuit succinctly put it in Sala, "[t]he existence of some potential profit is 'insufficient to impute substance into an otherwise sham transaction' where a 'common-sense examination of the evidence as a whole' indicates the transaction lacked economic substance."  613 F.3d at 1254 (quoting Keeler v. Comm'r, 243 F.3d 1212, 1219 (10th Cir. 2001)).  Here, a common sense look at the totality of the evidence reveals that the spread transaction, just as in Jade Trading, was designed not for real economic gain, but for tax avoidance.

Because the spread transaction lacked economic substance and must be disregarded on that ground alone, the Court does not reach the issue of whether Treasury Regulation §1.752-6 can be applied retroactively.

Plaintiff's petition for readjustment of the partnership items of K2 is **DENIED**, with costs awarded to Defendant.

s/Mary Ellen Coster Williams_____
**MARY ELLEN COSTER WILLIAMS**
**JUDGE**